## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | | |
|---|---|---|
| SHAFER & FREEMAN LAKES ENVIRONMENTAL CONSERVATION CORPORATION, CARROLL COUNTY, INDIANA, WHITE COUNTY, INDIANA, and CITY OF MONTICELLO, INDIANA, | ) ) ) ) ) ) | |
| *Petitioners,* | ) ) | No.   **19-1066** |
| v. | ) ) | |
| FEDERAL ENERGY REGULATORY COMMISSION, | ) ) ) | |
| *Respondent*. | ) ) | |

## PETITION FOR REVIEW

Acting pursuant to Section 313 of the Federal Power Act, 16 U.S.C. § 825l, Federal Rule of Appellate Procedure 15, and D.C. Circuit Rule 15, Shafer & Freeman Lakes Environmental Conservation Corporation; Carroll County, Indiana; White County, Indiana; and City of Monticello, Indiana (collectively Petitioners) petition this Court for review of the orders of Respondent Federal Energy Regulatory Commission listed below, and pray that those orders be modified or set aside in whole or in part:

1.    Order Amending License, Approving Revised Operation and

Compliance Plan, and Terminating Temporary Variance, *Northern*

*Indiana Public Service Company LLC*, 163 FERC ¶ 61,212 (June 21, 2018) (Attachment 1); and

2.  Order Denying Rehearing, *Northern Indiana Public Service Company LLC*, 166 FERC ¶ 61,030 (January 17, 2019) (Attachment 2).

This petition is timely filed "within sixty days after the order of the Commission upon the application for rehearing."  16 U.S.C. § 825l(b).

Dated:  March 15, 2019                Respectfully submitted,

/s/ Alan I. Saltman
Alan I. Saltman
Smith, Currie & Hancock LLP
1025 Connecticut Avenue, N.W., Suite 600
Washington, D.C.  20036
Telephone: 202-452-2140
aisaltman@smithcurrie.com

*Counsel for Petitioners*

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

| | |
|---|---|
| SHAFER & FREEMAN LAKES ENVIRONMENTAL CONSERVATION CORPORATION, CARROLL COUNTY, INDIANA, WHITE COUNTY, INDIANA, and CITY OF MONTICELLO, INDIANA, <br><br> *Petitioners,* <br><br> v. <br><br> FEDERAL ENERGY REGULATORY COMMISSION, <br><br> *Respondent.* | ) ) ) ) ) ) ) ) ) ) ) ) ) )    No.    **19-1066** |

---

### RULE 26.1 DISCLOSURE STATEMENT

Pursuant to Federal Rules of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1, Petitioners make the following disclosure:

<u>Non-Governmental Corporate Party to this Action</u>:  Shafer & Freeman Lakes Environmental Conservation Corporation (SFLECC)

<u>Parent Corporations</u>:  None.

<u>Publicly Held Company that Owns 10% of More of Party's Stock</u>:  None.

<u>Party's General Nature and Purpose</u>:  SFLECC is a not-for-profit, 501(c)(3) corporation established in 1994.  SFLECC is the owner of some 2,000 parcels comprising 4,000 acres of land around and beneath Lakes Freeman and Shafer, which it licenses to resident and vacation homeowners, rental properties, marinas,

and a host of local businesses.  SFLECC's mission is to protect and enhance the

environment and water quality of Lakes Freeman and Shafer, on its own behalf and

on behalf of its licensees, to facilitate public recreational use of the lakes.

Dated:  March 15, 2019                 Respectfully submitted,

                                       /s/ Alan I. Saltman
                                       Alan I. Saltman
                                       Smith, Currie & Hancock LLP
                                       1025 Connecticut Avenue, N.W., Suite 600
                                       Washington, D.C.  20036
                                       Telephone: 202-452-2140
                                       aisaltman@smithcurrie.com

                                       *Counsel for Petitioners*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the forgoing has been

furnished via electronic transmission (where email addresses are shown below) and

first-class mail with postage prepaid, this 15th day of March, 2019 to:

Claudia Earls, Esq., Chief Counsel
M. Bryan Little, Esq., Counsel
Northern Indiana Public Service Company, LLC
801 E 86th Ave.,
Merrillville, IN, 46410
cearls@nisource.com
blittle@nisource.com

Corporation Service Company
135 North Pennsylvania Street, Suite 1610
Indianapolis, IN 46204
*Registered agent for Northern Indiana*
*Public Service Company, LLC*

Dated:  March 15, 2019                 Respectfully submitted,

                                        /s/ Alan I. Saltman
                                        Alan I. Saltman

# 19-1066
# ATTACHMENT 1

163 FERC ¶ 61,212
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION


Before Commissioners:  Kevin J. McIntyre, Chairman;
Cheryl A. LaFleur, Neil Chatterjee,
Robert F. Powelson, and Richard Glick.


Northern Indiana Public Service Company LLC                    Project No. 12514-074


ORDER AMENDING LICENSE, APPROVING REVISED OPERATION AND
COMPLIANCE PLAN, AND TERMINATING TEMPORARY VARIANCE

(Issued June 21, 2018)

1.      On October 2, 2014, Northern Indiana Public Service Company LLC (NIPSCO or licensee)[1] applied to amend its license for the 16.4-megawatt (MW) Norway-Oakdale Hydroelectric Project No. 12514 (Norway-Oakdale Project), located on the Tippecanoe River in Carroll and White Counties, Indiana.[2]  As required by license Article 405, NIPSCO proposes to modify the interim definition of "abnormal river conditions" in license Article 403.

2.      As discussed in this order, we approve NIPSCO's proposed definition of "abnormal river conditions" and amend the project license accordingly.  We also approve a revised Project Operation and Compliance Plan and terminate a temporary variance.

---

[1] On March 12, 2018, Commission staff approved a transfer of the license from Northern Indiana Public Service Company to Northern Indiana Public Service Company LLC.  Staff acknowledged receipt of the signed acceptance sheets on June 6, 2018.

[2] NIPSCO made supplemental filings in 2015 on January 26, January 29, February 6, May 1, May 7, June 3, and November 6, and then a supplemental filing on August 29, 2016.

**Attachment 1**

## I.    Background

### A.    Project Description and Area

3.      On October 2, 2007, Commission staff issued a 30-year license to NIPSCO to maintain and operate the Norway-Oakdale Project.[3]  The project includes two developments:  the upper Norway development and the lower Oakdale development, located along a 19-mile segment of the Tippecanoe River.

4.      The Norway development has been operating since 1923 and includes:  a 915-foot-long dam, a powerhouse equipped with four generating units with a total authorized installed capacity of 7.2 MW, and the 1,291-acre Lake Shafer, which extends 10 miles upstream of Norway dam.  The Oakdale development has been operating since 1925 and includes:  a 1,688-foot-long dam, a powerhouse equipped with three generating units with a total authorized installed capacity of 9.2 MW, and the 1,547-acre Lake Freeman, which extends 10 miles upstream of Oakdale dam.

5.      Of the land within the project boundary, NIPSCO owns in fee only those lands under the dam structures, lands needed to access project facilities, and lands upon which certain NIPSCO buildings are located (approximately one percent of project lands).  NIPSCO holds a prescriptive easement over the remaining lands which are owned in fee by the Shafer and Freeman Lakes Environmental Conservation Corporation (Conservation Corporation) and approximately 4,300 private property owners.[4]

### B.    Project Operation

6.      License Article 403 requires NIPSCO to operate both developments, to the maximum extent practicable, in an instantaneous run-of-river mode such that the outflow from the Norway dam approximates the sum of inflows to Lake Shafer and the outflow

---

[3] *Northern Ind. Pub. Serv. Co.*, 121 FERC ¶ 62,009 (2007).  Although the Commission in 1921 and again in 1980 determined that the project was not required to be licensed, *id*. P 36, staff reversed this finding in 2000, based on a new navigation report which showed that the project is located on a navigable waterway.  *Northern Ind. Pub. Serv. Co.*, 92 FERC ¶ 62,258 (2000).  The licensee did not object to this finding and thereafter applied for a license.

[4] NIPSCO conveyed its ownership of these lands in 1995, after the Commission had concluded that the project was not required to be licensed.  Because of this, while the Commission typically requires a licensee to hold title to the lands that comprise the project reservoir, the license order did not require NIPSCO to reacquire title to the reservoir lands.  *Northern Ind. Pub. Serv. Co.*, 121 FERC ¶ 62,009 at P 40.

**Attachment 1**

from the Oakdale dam approximates the sum of inflows to Lake Freeman.  Further, Article 403 requires NIPSCO to maintain Lake Shafer within 0.25 feet above and below elevation 647.47 feet National Geodetic Vertical Datum (NGVD) and Lake Freeman within 0.25 feet above and below elevation 612.45 feet NGVD.[5]

7.      Article 403 provides that NIPSCO may temporarily modify run-of-river operations and reservoir elevations during "abnormal river conditions," which Article 403 defines as conditions with river flows of 3,000 cubic feet per second (cfs) or higher, or an hourly increase in river flow of 100 cfs or greater at both project dams.  During such conditions, NIPSCO must at all times maintain Lake Shafer within 0.75 feet above and 0.25 feet below elevation 647.47 feet NGVD, and Lake Freeman within 0.75 feet above and 0.25 feet below elevation 612.45 feet NGVD.  Article 403 does not allow the licensee to temporarily modify operations during low-flow conditions without the Commission granting a variance.

8.      The current definition of "abnormal river conditions" is an interim definition. License Article 405 provides that, within five years of license issuance, NIPSCO must propose a permanent definition of "abnormal river conditions" developed in consultation with the U.S. Fish and Wildlife Service (FWS) and the Indiana Department of Natural Resources (Indiana DNR).

9.      In addition, NIPSCO operates its project in compliance with its approved Project Operation Compliance Plan required by license Article 404, the reservoir drawdown rates required by license Article 406, and the approved tailwater rampdown rates set forth in license Article 408.[6]

---

[5] In its original licensing proceeding, NIPSCO provided information suggesting that the type and age of the equipment at the Norway and Oakdale developments limits the degree to which NIPSCO can minimize impoundment and tailwater fluctuations, and operate in an instantaneous run-of-river mode.  *See* Commission staff's February 16, 2007 final Environmental Assessment (EA) for licensing the project at 25-27. Article 403 recognized this in requiring that the project operate in a manner that approximates instantaneous run-of-river operation and allowing the reservoirs to be maintained within 0.25 feet above or below the specified elevations.  *See* 121 FERC ¶ 62,009 at P 29.

[6] *See Northern Ind. Pub. Serv. Co.*, 124 FERC ¶ 62,135 (2008) (Order Approving Project Operation Compliance Plan Under Article 404); *Northern Ind. Pub. Serv. Co.*, 127 FERC ¶ 62,050 (2009) (Order Modifying and Approving Tailwater Rampdown Monitoring Plan Pursuant to Article 408).

**Attachment 1**

### C.  NIPSCO's Requests for a Temporary Variance of Run-of-River Operation and Lake Elevations

10.     During the summer of 2012, northern Indiana experienced a severe drought, which caused low flows in the Tippecanoe River.  In July, FWS and Indiana DNR observed mussel mortality in the Tippecanoe River downstream of the Oakdale dam, including the sheepnose, clubshell, and fanshell species, which were federally-listed as endangered under the Endangered Species Act (ESA), and the rabbitsfoot, which was unlisted at that time.[7]  Shortly thereafter, FWS recommended that NIPSCO release a minimum flow of 200 cfs from the Oakdale dam to avoid take of the federally-listed mussels.[8]

11.     While maintaining the FWS-recommended 200-cfs flow, NIPSCO fell out of compliance with license Article 403 by allowing outflows from Oakdale dam to exceed inflows to Lake Freeman, which caused the surface elevation of Lake Freeman to fall below 612.20 feet NGVD.  Consequently, on August 3, 2012, NIPSCO requested a temporary variance of license Article 403 from July 1 through December 1, 2012, or until drought conditions improved sufficiently to resume normal operations.[9]  On October 4, 2012, Commission staff approved NIPSCO's request for a temporary variance.[10]

12.     On November 28, 2012, NIPSCO requested an extension of its temporary variance, explaining that severe drought and historic low-flow conditions continued to persist in the region.  On April 22, 2013, Commission staff granted NIPSCO's request which extended the variance until December 1, 2013.[11]

13.     During the summer of 2013, mussel kills continued downstream of the Oakdale dam.  On September 17, 2013, NIPSCO requested an extension of time to comply with Article 405's requirement to develop a permanent definition of "abnormal river

---

[7] Rabbitsfoot mussels were listed as threatened under the ESA on September 17, 2013.

[8] FWS's July 10, 2012 Filing.  The term "take" means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or attempt to engage in any such conduct.  16 U.S.C. § 1532(19) (2012).

[9] NIPSCO August 3, 2012 Filing.

[10] *Northern Ind. Pub. Serv. Co.*, 141 FERC ¶ 62,012 (2012).

[11] *Northern Ind. Pub. Serv. Co.*, 143 FERC ¶ 62,043 (2013).

**Attachment 1**

conditions."[12]  After conducting a systematic analysis of downstream conditions, FWS determined that a 200 cfs discharge from Oakdale dam was no longer sufficient to prevent a taking of endangered mussels downstream of the dam, and stated that NIPSCO would instead be required to ensure a 500-cfs flow at the U.S. Geological Survey (USGS)[13] Delphi gage, 11 miles downstream of the Oakdale dam.[14]

14.     NIPSCO estimated that, in order to ensure a 500 cfs flow at the Delphi gage, it would need to release a minimum flow of 450 cfs from Oakdale dam, and on December 11, 2013, requested a temporary variance in order to do so.  Throughout 2014, NIPSCO worked with the resource agencies to test various operational scenarios to find an approach to augment low flows that was acceptable to FWS but would also prevent significant drawdowns in Lake Freeman, a popular destination for summer recreation and tourism.  On April 30, 2014, NIPSCO requested an amendment to its temporary variance to allow it to release any minimum flow from the Oakdale dam necessary to ensure flows of 500 cfs at the Delphi gage.

15.     In July and August 2014, flows in the Tippecanoe River declined and NIPSCO's releases to ensure a 500 cfs minimum flow for mussels began drawing down Lake Freeman.  By August 7, NIPSCO had drawn down Lake Freeman by 15 inches.[15]  On August 11, NIPSCO requested an additional amendment to its December 2013 temporary variance in order to estimate downstream flows using the USGS Oakdale gage, located 0.25 miles downstream of the Oakdale dam, instead of the Delphi gage, to provide a more accurate reading.

16.     On August 13, 2014, FWS issued a Technical Assistance Letter (Assistance Letter) to NIPSCO, identifying dam operation measures that FWS stated would mimic natural run-of-river conditions in order to avoid project-induced take of federally-listed

---

[12] In 2013, NIPSCO also requested additional time to comply with license Article 411, which required it to file a Mussel Enhancement Plan.  NIPSCO filed that plan on January 29, 2015.  The Commission will act on that plan once this proceeding has been concluded.

[13] The USGS operates stream gages nationwide as part of its National Streamflow Network to provide consistent streamflow information to meet local, tribal, State, regional, and national needs.

[14] *See* NIPSCO's October 3, 2014 Filing at 2.

[15] NIPSCO August 7, 2014 Letter and Incident Report Relating to Lake Freeman Elevation Levels.

**Attachment 1**

mussels and avoid adverse modification of critical habitat attributable to project operation.[16]

17.    On August 15, NIPSCO requested an additional amendment to its temporary variance to release a minimum flow in accordance with procedures identified in the Assistance Letter.  On August 22, Commission staff granted the temporary variance, which has remained in effect pending disposition of the license amendment application before us.[17]

18.    On October 2, 2014, as required by license Article 405, NIPSCO filed a license amendment application proposing a modified definition of "abnormal river conditions" consistent with the Assistance Letter.  In addition, NIPSCO filed an amended Project Operation Compliance Plan required by license Article 404.

### D.    Technical Assistance Letter and NIPSCO's Modified Definition of "Abnormal River Conditions"

19.    FWS explained that it developed the Assistance Letter to identify project operations that would create natural run-of-river flows and preclude large flow variations during periods of low flow.[18]  FWS found that existing project operations have caused flows downstream of the project to vary significantly from flows upstream of the project, often by several hundred cfs in the span of 24 to 48 hours, and states that federally-listed mussels are poorly adapted to such flow variations, especially during low to moderate flow conditions.

20.    The Assistance Letter sets forth an abnormal low-flow plan that is triggered by an abnormal low-flow event, which the letter defines as occurring when the 24-hour daily average flow is equal to or less than 300 cfs at the USGS Winamac gage, located 30 river miles upstream of the Norway dam and 45 river miles upstream of the Oakdale dam, or is equal to or less than 570 cfs at the Oakdale gage, located 0.25 miles downstream of the Oakdale dam.  When an abnormal low-flow event occurs, the abnormal low flow plan requires NIPSCO to stop generation at the Oakdale development and release 1.9 times the

---

[16] FWS issued three clarifications to the Assistance Letter filed with the Commission on October 2, 2014 (clarifying flows that trigger and terminate an abnormal low-flow event); November 6, 2015 (addressing gage malfunctions); and June 7, 2016 (clarifying that NIPSCO was not required to release more than 500 cfs from the Oakdale dam).

[17] *Northern Ind. Pub. Serv. Co.*, 148 FERC ¶ 62,156 (2014).

[18] The Assistance Letter is set forth in Appendix B to this order.

**Attachment 1**

flow of the previous 24-hour daily average flow measured at the Winamac gage, or 500 cfs, whichever is less. The abnormal low-flow event ends when the 24-hour daily average flow is greater than 300 cfs at the Winamac gage and greater or equal to 500 cfs at the Oakdale gage. The Assistance Letter does not affect operations at the Norway development.

21.     FWS states that it selected the trigger flows and downstream flow requirements for abnormal low-flow conditions by using linear scaling.[19] Linear scaling is commonly used as a proxy for discharge, based on the assumption that discharge increases as drainage basin area increases.[20] Some academic research has shown that discharge appears to scale (increase or decrease) linearly or nearly linearly with drainage area in basins with uniform hydrology (e.g., precipitation and runoff generation).[21] In this instance, the drainage area at the Oakdale gage is 1,790 square miles, which is 1.9 times as large as the drainage area at the upstream Winamac gage, 942 square miles. Thus, FWS assumes that natural flows at Oakdale should be 1.9 times the existing flow at the Winamac gage.

22.     FWS explains that it used the Winamac gage to set trigger flows and approximate natural flows because it is the closest upstream gage that is unaffected by the project. However, NIPSCO, FWS, and USGS have been working to bring a new gage on line at Buffalo Bridge, approximately 12.5 miles upstream of Lake Shafer and 34.9 miles upstream of the Oakdale dam. By using a gage at Buffalo Bridge, NIPSCO states that it would be able to approximate flows at a point that is not subject to potential water withdrawals that occur between the Winamac and Buffalo Bridge gages.[22]

23.     On October 2, 2014, in order to implement the Assistance Letter and the abnormal low flow plan, NIPSCO proposed to modify the definition of "abnormal river conditions" in license Article 403 to the following:

---

[19] *See* EA at 42. Linear scaling is a method of estimating stream flow at an ungaged stream site with a known drainage area based on flows measured at a gaged site with a known drainage area. The method assumes that the only factor affecting flows between the two sites is the size of the drainage areas. The method is also known as the drainage area ratio method. A linear relationship is shown by a straight line, as opposed to other types of relationships (e.g., exponential or logarithmic).

[20] *See* FWS's August 13, 2014 Filing at 3.

[21] *See* Joshua Galster, *Natural and anthropogenic influences on the scaling of discharge with drainage area for multiple watersheds*, GEOSPHERE, August 2007, at 260.

[22] *See* NIPSCO's October 2, 2014 Application at 6.

**Attachment 1**

Conditions with river flows of 3,000 cubic feet per second (cfs) or higher; hourly increases in river flow of 100 cfs or greater at both project dams; a 24-hour daily average of river flow of ≤ 300 cfs as measured at the USGS Winamac gage; in the event of an equipment or operation issue at Oakdale unrelated to weather conditions upstream, a 24-hour daily average of river flow of ≤ 570 cfs at the USGS Oakdale gage; or a 24 hour daily average of river flows of ≤ 410 cfs at the NIPSCO Buffalo Bridge gage. Under "abnormal river conditions," as defined by river flow, the licensee shall at all times act to maintain the fluctuation of the reservoir surface elevation within 0.75 feet above (rather than 0.25 feet under normal conditions) and 0.25 feet below elevation 647.47 feet NGVD for Lake Shafer and 0.75 feet above 612.45 feet NGVD for Lake Freeman.

24.    NIPSCO does not propose a minimum elevation for Lake Freeman during abnormal flow conditions.

## II.    Notice, Interventions, and Comments

### A.    Notice of the Application

25.    On February 12, 2015, Commission staff issued a notice of NIPSCO's application, establishing March 16, 2015, as the deadline for filing comments, motions to intervene, and protests, which staff extended to April 15, 2015, and thereafter to May 15, 2015. The Conservation Corporation, together with Carroll and White counties and the City of Monticello (collectively, the Protest Coalition); and Brett Longenecker filed timely, unopposed motions to intervene.[23]

26.    A few individuals filed comments supporting the amendment, and a number filed comments in opposition, requesting that the Commission require NIPSCO to maintain current operations. Many commenters indicate that they experienced the August 2014 drawdown of Lake Freeman and express concern that NIPSCO's proposed amendment would similarly result in drawdowns during future regional droughts. They argue that such drawdowns hinder recreational access to watercraft and to the lake, which is a popular destination during the summer recreation season. They also maintain that drawdowns damage shoreline structures, expose the muddy lake bottom, affect aquatic wildlife, and release noxious odors from decaying aquatic life. They argue that such

---

[23] Timely, unopposed motions to intervene are granted by operation of Rule 214(c) of the Commission's Rules of Practice and Procedure. 18 C.F.R. § 385.214(c) (2017).

**Attachment 1**

effects negatively impact property values, seasonal recreation, and tourism, on which they state the local economy and tax base depend.

27.     The Protest Coalition filed comments arguing that the existence of the Oakdale development does not alter the natural flow of the Tippecanoe River during periods of low flow and that it is inappropriate to use a linear scaling method to approximate natural flows downstream of the Oakdale dam.  In support, the Protest Coalition filed two reports by hydrologists Dr. Bernard Engel and Dr. Robert Criss, which assert that the best available science demonstrates that the Oakdale dam does not alter the natural flows, and therefore does not harm mussels; that linear scaling cannot predict natural flows; and that FWS has misapplied linear scaling in this case.  Based on these reports, the Protest Coalition asserts that FWS's use of linear scaling does not satisfy the ESA's best available science standard or the Federal Power Act's substantial evidence standard. Accordingly, the Protest Coalition requests that the Commission not defer to the FWS's linear scaling method, deny the application for amendment, rescind the temporary variance, and direct that operations of the dams resume as required by the 2007 license until NIPSCO develops what FWS considers a valid definition of "abnormal river conditions."

## B.     Request for Public Hearing

28.     The Protest Coalition requested a public hearing to conduct discovery into the development of the proposed license amendment and the Assistance Letter, and to present the testimony of its hydrology experts.  We believe that the record is sufficiently well-developed in this matter that a public hearing is not necessary.  Commission staff held a publicly-noticed technical conference on May 10, 2016, to solicit comments on staff's draft EA and on the various hydraulic analyses and expert opinions available.  The Protest Coalition had an opportunity to present its analysis and to ask the FWS questions regarding the methods of its Assistance Letter during the technical conference.  We therefore deny the request for a public hearing.

## III.   Environmental Assessment

29.     On October 9, 2015, Commission staff issued a draft EA.  The draft EA evaluated the proposed action (to implement the Assistance Letter by adopting the definition of abnormal river conditions described in P 23, above); the no-action alternative, in which project operations would not change; and staff's alternative, described in detail below, under which NIPSCO would not release minimum flows that exceed inflow.  As part of its EA, Commission staff prepared a hydrologic and hydraulic study report which examined the Tippecanoe River system in the vicinity of the project in order to evaluate the adequacy and availability of water downstream of Oakdale dam to provide protective flows for federally-listed mussels.

**Attachment 1**

30.    The draft EA found that NIPSCO's proposed action would overestimate inflows to Lake Freeman because it was based on the linear scaling method using data from the Winamac gage, located 45 miles upstream from the Oakdale dam, and, as a result, did not account for local hydrologic events, including groundwater inflows, stormwater runoff, evaporation, tributary inflows, changes in the accuracy of flow measurements over time, or lag time for measured flows to reach the project.[24]  Staff determined that overestimating inflows to Lake Freeman would not represent run-of-river conditions and, when combined with removal of the lower lake-level restriction for Lake Freeman that exists under normal operating conditions, could draw down Lake Freeman by 12 feet or more.[25]

31.    The staff alternative separately defines abnormal high flows and abnormal low flows.  Under the staff alternative, abnormal low flows would be triggered by the same flows as provided in the proposed amendment and Assistance Letter; however, NIPSCO would not have to release minimum flows that exceed inflow, thus causing Lake Freeman to drop.  Rather, the staff alternative would require the licensee to cease generation at both developments and operate the gates to maintain Lakes Schafer and Freeman at the levels where they were when generation ceased.  Once a triggering event occurs, outflows would equal inflows and storage in Lake Freeman would not be called upon to augment low flows downstream of Oakdale dam.

32.    The draft EA found that Commission staff's alternative would reduce adverse effects of project operations on endangered mussels by requiring that lake levels be held constant during abnormal low-flow conditions.  This, the draft EA explained, may slightly enhance conditions for listed mussels downstream of the project compared to current conditions, by mimicking the natural hydrology of the river and by reducing rapid flow fluctuations that can adversely affect downstream mussels and subject them to stranding, desiccation, and predation, while protecting the numerous resources of Lake Freeman that depend on stable lake levels.[26]  Accordingly, the draft EA recommended the staff alternative.

33.    NIPSCO, the Protest Coalition, FWS, Indiana DNR, and the U.S. Environmental Protection Agency (EPA) filed comments on the draft EA.  NIPSCO commented that the staff alternative is not operationally feasible, because the equipment at the dam was not designed, nor can it be modified, to maintain consistent reservoir elevations.  The Protest Coalition agrees with the staff alternative, finding that the science does not support the

---

[24] Draft EA at 65.

[25] *Id.* at 69.

[26] *Id.* at 80.

**Attachment 1**

use of linear scaling. Indiana DNR and FWS disagree with the staff alternative, stating that it is not feasible for NIPSCO to maintain a static lake level and release a comparatively consistent hourly or daily flow downstream of the dam.

34.    The Office of Indiana's Lieutenant Governor filed a report on February 16, 2016, that assesses whether low-flow conditions developed by the FWS are compatible with power production and recreational uses of the lake.[27]  The report finds that the linear scaling method recommended by FWS overestimates low flows and will result in flow exceeding natural conditions.  Further, the report states that Commission staff's proposal would result in flows that are similar to natural conditions and is the best practical method to ensure flows are available to maintain downstream habitat for federally-listed species.

35.    As discussed above, Commission staff conducted a publicly-noticed technical conference on May 10, 2016, to discuss the proposed operational changes; the hydraulic analyses performed by NIPSCO, Commission staff, and the Protest Coalition; alternatives to NIPSCO's proposal; and Commission staff's analysis in the draft EA.  Along with Commission staff, NIPSCO, FWS, and the Protest Coalition participated in the conference.  Thereafter, NIPSCO, FWS, and the Protest Coalition met on multiple occasions to discuss methods for approximating natural run-of-river flows and minimizing flow variability.  The parties did not reach an agreement.

36.    On November 10, 2016, Commission staff issued a final EA, recommending a modified staff alternative that requires, under abnormal low-flow conditions, that NIPSCO "immediately cease generation at the Oakdale [d]evelopment and at all times act to maintain the reservoir elevation at Lake Freeman at elevation 612.20 feet NGVD."[28] Staff also requested concurrence from FWS that the staff alternative was not likely to adversely affect federally-listed mussels or adversely modify designated critical habitat. FWS and the EPA filed comments on the final EA.  EPA recommended the Commission coordinate with the FWS, clarify whether impacts to mussels would be significant, and assess whether the operation of the project would be resilient to changing climate conditions.  As discussed more fully below, FWS did not concur with Commission staff's ESA finding and requested additional information to prepare its biological opinion.

---

[27] The Indiana Lieutenant Governor's report was part of a larger water use study.

[28] Final EA at 17 (all further references in this order to the EA are to the final EA, unless otherwise noted).

**Attachment 1**

## IV.   Discussion

### A.   Threatened and Endangered Species

37.    Section 7(a)(2) of the Endangered Species Act of 1973[29] requires federal agencies to ensure that their actions are not likely to jeopardize the continued existence of federally-listed threatened and endangered species, or result in the destruction or adverse modification of their designated critical habitat.  Federal agencies implement this requirement in consultation with FWS (or the National Marine Fisheries Service, as appropriate).  The action agency (the Commission) analyzes the proposed action and determines whether it may affect listed species.  If the Commission finds that its proposed action is "not likely to adversely affect" the species or its habitat, it requests concurrence from the consulting agency (in this case, FWS).  If FWS concurs in writing, informal consultation is sufficient and no further action is required.[30]  Otherwise, formal consultation is required and FWS prepares a biological opinion on the proposed action.  Depending on the circumstances, a biological opinion may include reasonable and prudent alternatives to avoid jeopardy, reasonable and prudent measures to avoid or minimize incidental taking of the species, and terms and conditions to implement those measures.[31]

38.    Seven federally-listed mussel species and two federally listed mammals are known to occur in the Norway-Oakdale Project vicinity, including:  the endangered Northern rifleshell, clubshell, rayed bean, sheepnose, snuffbox, and fanshell mussels; the threatened rabbitsfoot mussel; the endangered Indiana bat; and the threatened northern long-eared bat.[32]  FWS designated critical habitat for the rabbitsfoot mussel in September 2013, covering a 47-mile reach of the Tippecanoe River from Indiana Highway 14  near the Town of Winamac in Pulaski County, Indiana, downstream to its confluence with the Wabash River northeast of Battle Ground in Tippecanoe County, Indiana.  However, this

---

[29] 16 U.S.C. § 1536(a) (2012).

[30] *See* 50 C.F.R. § 402.13(a) (2017).

[31] Section 9 of the ESA, 16 U.S.C. § 1538 (2012), makes it unlawful for any person to "take" an individual member of a listed fish or wildlife species, unless authorized pursuant to an incidental take statement in a biological opinion issued following formal consultation, or in accordance with an incidental take permit issued under ESA section 10, 16 U.S.C. § 1539 (2012).  "Take" is defined as "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct."  16 U.S.C. § 1533(19) (2012).

[32] EA at 5.

**Attachment 1**

designated critical habitat excludes Lakes Shafer and Freeman and the reach of the Tippecanoe River between the two lakes.  FWS has also designated critical habitat for the Indiana bat, but no areas were designated for Carroll or White counties, where the project is located.[33]

39.     In the draft EA, Commission staff determined that its alternative would have no effect on the northern long-eared bat, or the Indiana bat and its designated critical habitat, because those species have not been identified in the vicinity of the proposed project.[34] Therefore, no further action under the ESA is required for these species.

40.     The draft EA concluded that amending the Norway-Oakdale Project license as proposed by staff (i.e., with the staff-recommended alternative) is not likely to adversely affect listed mussels or adversely modify designated critical habitat for mussels.  On October 16, 2015, staff requested concurrence from FWS.  On November 6, 2015, FWS declined to consider staff's request for concurrence until staff addressed what it described as misinterpretations and inadequacies of the draft EA.

41.     On November 10, 2016, Commission staff issued a final EA that slightly modified the staff alternative to exclude Lake Shafer from staff's recommended alternative and again requested concurrence that the alternative was not likely to adversely affect listed mussels or adversely modify designated critical habitat.  In the event that the FWS did not concur, staff requested formal consultation and stated that its final EA would serve as the Commission's biological assessment.  By letter dated December 9, 2016, FWS stated it did not concur with Commission staff's finding and requested additional information to prepare its biological opinion.[35]  On February 16, 2017, staff provided FWS with the requested additional information and asked for formal consultation.

42.     On July 6, 2017, the FWS issued a biological opinion for the modified staff alternative.  The biological opinion concurs that the staff alternative is not likely to adversely affect the rayed bean and snuffbox mussels, because it is unlikely those species still occur downstream of the project.[36]  Further, the biological opinion concludes that the staff alternative is not likely to jeopardize the continued existence of the clubshell,

---

[33] *Id.*

[34] Draft EA at 64.

[35] *See* FWS's December 9, 2016 filing.

[36] FWS's July 5, 2017 Biological Opinion at 2.

**Attachment 1**

fanshell, sheepnose, and rabbitsfoot mussels, and is not likely to destroy or adversely modify designated rabbitsfoot critical habitat.[37]

43.    The biological opinion includes an incidental take statement, with one reasonable and prudent measure to avoid or minimize incidental take, and two terms and conditions to implement that measure.  The reasonable and prudent measure is to minimize take of listed mussels by restoring what FWS considers to be a more natural flow regime downstream of Oakdale dam during low-flow periods.  To implement the reasonable and prudent measure, the terms and conditions require the adoption of NIPSCO's proposed license amendment and implementation of the Assistance Letter, as clarified, and replacement of readings from the Winamac gage with those from the Buffalo Bridge gage, once that gage is operational.

44.    As discussed below, the modified incidental take statement, reasonable and prudent measures, and terms and conditions are incorporated into the license by ordering paragraph (D) and are attached to this order as Appendix A.[38]

       **1.**    **Terms and Conditions**

          **a.**    **Implement the Terms of the Assistance Letter**

45.    Article 403 requires NIPSCO to operate the project in an instantaneous run-of-river mode and allows for a fluctuation of lake levels of 0.25 feet above and below a target elevation (647.47 feet NGVD for Lake Shafer and 612.45 feet NGVD for Lake Freeman).  NIPSCO is required to minimize the fluctuation of the two reservoirs' surface elevations by maintaining discharges from the project so that, at any point in time, flows, as measured immediately downstream from the project tailraces approximate the sum of inflows to the project reservoirs.  For both developments, river flow must be passed on an instantaneous basis at times when the turbines are not in operation.  FWS asserts that this mode of operation, in conjunction with low flows during the drought of 2012, adversely affected aquatic habitat and resulted in mussel kills downstream of Oakdale dam.

---

[37] EA at 64.  In a 2008 comment letter, FWS stated that northern riffleshell mussels are not known to be extant in the Tippecanoe River.

[38] The incidental take statement states that the Commission must comply with the terms and conditions that are needed to implement the reasonable and prudent measures to avoid or minimize incidental take.  This is incorrect.  The Commission must determine whether to make the terms and conditions part of the license, but it is the licensee that must comply with them.

**Attachment 1**

46.    FWS states that under the Commission staff's alternative, during the late summer and early autumn, when flows are often naturally low, the quantity of water released from Oakdale dam would not match the flows that FWS has determined would best mimic the natural flow of the river (i.e., the linearly-scaled flow measured at the Winamac Gage). Rather, FWS states that the best way to protect mussel populations is to maintain run-of-river operations at the Oakdale development using linear scaling.

47.    In developing its biological opinion, FWS examined NIPSCO's elevation data for Lake Freeman during droughts in 1988 and 2012, which it states were comparable.[39] FWS explained that, while many other Indiana reservoirs approached record low levels during the 1988 drought, Lake Freeman never varied more than 0.14 inch from the design pool of 610.35 feet.[40] FWS states that since the elevation of Lake Freeman remained static during both the 1988 and 2012 droughts, it is logical to assume that downstream flows were curtailed in 1988 as they were in 2012 in order to achieve lake level stability. FWS explained that a 1990 survey of the Tippecanoe River observed very few mussels downstream of Oakdale dam, stating that "riffles in these areas supported very few mussels, possibly because they are intermittently exposed when little water is released from the reservoirs."[41]

48.    FWS maintains that, since construction of the dams, artificially-reduced flows downstream of Oakdale dam have occurred many times as a result of the management of flows to maintain precise lake levels, and that Commission staff's alternative would lead to similar results.  FWS explains that the probability of mussel mortality linked to dam management is likely to increase with the duration of the natural low-flow period, and that it is essential to the protection of mussels that the Norway-Oakdale Project be managed to avoid even brief episodes of inadequate flow downstream of Oakdale dam.[42]

49.    FWS states that, since August 2014, NIPSCO has demonstrated that it can implement the terms of the Assistance Letter with minimal effects to overall project operations.  As a result, FWS concludes that it continues to support the Assistance Letter as the best currently-available approach to mimic natural flow downstream of the Norway-Oakdale Project, and that this approach will minimize mortality of listed mussels by approximating what would occur naturally during low-flow events.

---

[39] FWS's July 5, 2017 Biological Opinion at 19.

[40] *Id.*

[41] *Id.* at 20.

[42] *Id.*

**Attachment 1**

50.    At issue is a difference of opinion regarding how best to approximate run-of-river operations at the Oakdale development.  Although FWS believes its method would best mimic natural flows in the river, thereby minimizing adverse effects to mussels that FWS attributes to project operation, Commission staff concludes that allowing the reservoir to be drawn down during low-flow periods is not consistent with run-of-river operations and would provide greater flows than would otherwise occur naturally.  As a result, the project will be required to supplement natural flows, with negative effects on other resources.[43]

51.    As discussed in the final EA, staff's analysis indicates that several factors are likely to impede the effectiveness of the Assistance Letter protocols in achieving its stated purpose.  These factors relate primarily to inaccuracies associated with estimating inflows to the project using data from a stream gage that is located 45 miles upstream from the project, including changes in the accuracy of flow measurements over time, lag time for the measured flows to reach the project, and the influence of local hydrologic events.  All of these factors could contribute to flow releases that are not representative of run-of-river conditions.[44]  Although not labelled as such, the 1988 data that FWS used to develop its biological opinion consist of mean values for daily flow, generation, and lake elevation.[45]  Because these values represent averages over a 24-hour period, we do not believe they are useful to determine conditions at any given instant.[46]  Rather, over time the use of these values would lead to drawdowns of Lake Freeman, because the linear scaling approach recommended by FWS fails to consider water losses from withdrawals and evaporation between the Winamac and Oakdale gages.

---

[43] NIPSCO recognized this difference of opinion in its August 31, 2017 comments, requesting that the Commission and FWS work together to find a solution acceptable to both agencies, so that it would not be placed "in the untenable position of choosing between contradictory compliance requirements." NIPSCO's comments at 5 (filed Aug. 31, 2017).  Commission staff issued the temporary variance on August 22, 2014, to eliminate the immediate situation of NIPSCO being subject to contradictory requirements.  By requiring that NIPSCO implement the incidental take conditions of the biological opinion, we have eliminated that result long-term as well.

[44] EA at v, 44-45.

[45] *Id.* at Appendix 4.

[46] For example, using 24-hour daily averages, it would be possible to obtain a 500 cfs average daily flow when, in fact, flows were 0 cfs for 12 hours and 1,000 cfs for 12 hours.

**Attachment 1**

52.      Removal of the lower lake-level restriction for Lake Freeman would allow
NIPSCO to use storage from Lake Freeman to comply with the flow releases from
Oakdale dam required by the Assistance Letter.  Analysis of historical flow records
provided in the final EA indicates that the potential exists for Lake Freeman to be drawn
down significantly during low flow periods to meet the flows required by the Assistance
Letter.  These drawdowns would result in frequent and substantial adverse effects on
other environmental resources associated with Lake Freeman.  The bathymetry of the
lake is such that, even a drawdown of about 1.5 feet in Lake Freeman as occurred in
August 2014 resulted in lake levels that:  (a) prevented use of docks and boat lifts, thus
stranding boats above the water level; (b) caused boat ramp closures; (c) created unsafe
boating conditions; (d) created a noxious odor due to mortality of fish and mussels and
decay of exposed aquatic vegetation in the lake; (e) significantly diminished recreational
experiences; and (f) potentially endangered cultural resources present at the lake.[47]  Staff
developed its recommended alternative definition of abnormal river conditions for
Article 403 to eliminate flow fluctuations associated with project operations during
periods of low flow, while avoiding these adverse effects of drawdowns.

53.      Despite these concerns, however, the ESA constrains our discretion to implement
staff's recommended alternative.  Staff's approach reflects the Commission's
responsibility under the FPA to strike an appropriate balance among competing
resources.  The ESA is more narrowly focused on protecting threatened and endangered
species.  Therefore, although we might ordinarily prefer staff's alternative to balance
non-developmental and developmental uses under FPA section 10(a)(1), in this case the
ESA compels a different result.  The Supreme Court has observed that, although a
biological opinion is theoretically advisory in nature, as a practical matter it "has a
powerful coercive effect on the action agency."[48]  This is particularly the case with
respect to measures in an incidental take statement.  As noted earlier, ESA section 9
prohibits any taking of a listed species, except in compliance with an incidental take
statement included in a biological opinion after formal consultation.  Violations of the
ESA, including the taking prohibition, present a risk of civil and criminal penalties,
including imprisonment.  Although the Commission is ultimately responsible for
ensuring that its proposed actions comply with the ESA and thus may choose to disregard
the provisions of a biological opinion, the Supreme Court has recognized that an agency
does so "at its own peril (and that of its employees)"[49]  As a result, the Commission
routinely treats the reasonable and prudent measures in an incidental take statement, and
the terms and conditions implementing those measures, as mandatory conditions and

---

[47] EA at v.

[48] *Bennett v. Spear*, 520 U.S. 154, 169 (1997).

[49] *Id.* at 170.

**Attachment 1**

includes them in the license.  Therefore, because FWS made compliance with the terms of the Assistance Letter an ESA reasonable and prudent measure, we will require it.

### b.    Buffalo Bridge Gage

54.    In October 2014, NIPSCO installed a flow gage 12.5 miles upstream of the project at Buffalo Bridge.  FWS indicates in the Assistance Letter that it would be amenable to using the Buffalo Bridge gage because of its proximity to the Oakdale dam, if it is determined that flows can be reliably measured at that site.  In 2016, however, USGS determined that the gage location was not appropriate, and NIPSCO and the agencies are considering alternative locations in the vicinity of Buffalo Bridge.[50]

55.    In the EA, staff recommends requiring NIPSCO to continue to evaluate an alternative gage site closer to the project than the Winamac gage in consultation with FWS and USGS.  Reducing the ratio between inflow to Lake Shafer and drainage area at Oakdale dam would greatly increase the accuracy of the Assistance Letter methodology for calculating daily downstream flows.

56.    Because the Buffalo Bridge gage is not currently in place, we cannot require NIPSCO to use it.  However, if USGS in the future determines that a new gage location in the vicinity of Buffalo Bridge is appropriate, NIPSCO will have to work with the FWS, as required by FWS's terms and conditions, and replace readings from the Winamac gage with those from the Buffalo gage as the key metric defined in the Assistance Letter, upon authorization by the FWS.

### c.    Conservation Measures

57.    FWS also included two conservation recommendations in its biological opinion. Unlike the reasonable and prudent measure and its associated terms and conditions, which are mandatory to avoid a prohibited taking under the ESA, conservation recommendations are discretionary agency activities designed to minimize or avoid effects to listed species or critical habitat, to help implement recovery plans, or to develop information.

58.    The first conservation recommendation would require NIPSCO to minimize large swings in discharges (greater than 150 cfs) from the Oakdale dam when flows are between 300 and 525 cfs at the Winamac gage, except when swings are tied to natural events.  While NIPSCO may choose to implement this recommendation, we will not require it.  FWS provides no support for limiting the rate of downstream flow changes to 150 cfs or less within a 24-hour period, and doing so would constrain the licensee's ability to respond to changes in reservoir inflow.  Moreover, staff's analysis suggests that

---

[50] EA at 27.

this measure would not provide any additional protection for listed mussels, because all swings in discharges greater than 150 cfs would result from natural events.

59.    FWS's second conservation recommendation would require NIPSCO to support Indiana DNR and FWS in their annual monitoring of listed mussels downstream of the Oakdale dam.  Again, while NIPSCO may choose to implement this recommendation, we will not require it.  The recommended monitoring is for information only, and the Commission generally prefers that monitoring inform a specific purpose, for example, whether to make additional flow changes or whether a specific measure is effective.  In addition, this order adequately protects downstream mussels by requiring NIPSCO to operate the project in accordance with the incidental take provisions of FWS's biological opinion.  As a result, there is no need for additional monitoring.

### B.    Protest Coalition

60.    On October 3, 2017, the Protest Coalition filed comments challenging FWS's biological opinion, arguing that FWS did not formulate its reasonable and prudent measure using the best scientific and commercial data available.  In support, the Protest Coalition argues that the studies on linear scaling that FWS relies on contain several inaccuracies and errors, and do not support the use of linear scaling during periods of low flow, but rather studied the effect of impervious surfaces on the rate of flow in two watersheds during peak flows.[51]  Further, the Protest Coalition maintains that FWS's biological opinion ignores reports by expert hydrologists criticizing the methodology and assumptions of linear scaling, and a paper by the author of linear scaling discussing the method's limitations.

61.    The Protest Coalition also maintains that there will be no incidental take in connection with implementing the Commission staff's alternative, because mussel mortality is frequently caused by naturally-occurring low flows unrelated to the Norway-Oakdale Project.[52]  Accordingly, the Protest Coalition alleges that there is no basis for FWS to impose a reasonable and prudent measure on NIPSCO's license.

62.    The Protest Coalition argues that FWS is not legally authorized to require implementation of the proposed reasonable and prudent measure because it would result in major changes to the Commission staff's alternative.[53]  It states that while FWS is authorized to specify reasonable and prudent measures necessary to minimize impacts on

---

[51] *See* Protest Coalition's October 3, 2017 Filing at 9-10.

[52] *Id.* at 11-13.

[53] *Id.* at 15-16.

**Attachment 1**

an endangered species, those measures "cannot alter the basic design, location, scope, duration, or timing of the action and may involve only minor changes" to the proposed action.[54]  The Protest Coalition maintains that the reasonable and prudent measure constitutes a major change to staff's alternative because the measure would allow NIPSCO to draw down Lake Freeman by more than the 0.25 feet permitted by the current license and release additional minimum flows downstream of Oakdale dam and adds that, because FWS has exceeded its authority under 50 C.F.R. § 402.14, the Commission cannot adopt FWS's biological opinion.[55]

63.     The Protest Coalition's arguments do not persuade us to not rely on the FWS biological opinion and adopt staff's alternative.  Although the Commission must make an independent decision under the FPA as to what measures should be included in a license, we are unlikely to contradict the consulting agency's recommendations in the absence of a showing that the biological opinion and the remainder of the record do not provide substantial evidence to support them.  The Protest Coalition has not made such a showing here.

64.     Although FWS has stated that its goal is to mimic natural flows, this is not a constraint; FWS has the discretion under the ESA to require that the project provide additional flows to protect the mussels during times of low flow.  Therefore, the fact that FWS's method would augment natural flows is not dispositive and would not provide us with a basis for rejecting this approach.

65.     The areas of disagreement between the Protest Coalition and FWS concern the nature and quality of the evidence on which FWS has relied and the ultimate conclusions that may appropriately be drawn from that evidence.  Staff's analysis concurred with the Protest Coalition's hydrology experts, concluding that there are legitimate concerns with the applicability of the linear scaling approach for use in determining low flow requirements for the Norway-Oakdale Project.[56]  However, these concerns are not sufficient to lead us to reject FWS's determination that additional flows are needed to protect listed species.  Nor would they provide any basis for rejecting FWS's finding that project operations can result in incidental taking of listed mussel species.

66.     We also disagree with the Protest Coalition's assertion that implementation of FWS's proposed reasonable and prudent measure would result in major changes to the

---

[54] *Id.* at 15 (citing 50 C.F.R. § 402.14(v)(2); *Westlands Water District v. U.S. Department of the Interior*, 376 F.3d 853, 876 (9th Cir. 2004)).

[55] *Id.* at 16.

[56] EA at 45.

**Attachment 1**

staff alternative.  We acknowledge that FWS's reasonable and prudent measure would result in lower reservoir levels during low flow periods.  However, this approach is designed to achieve the same purpose – to approximate run-of-river flow and protect downstream mussel populations.  In addition, it would not change the action's basic design, location, scope, duration, and timing.[57].

67.     The Protest Coalition requests that we review the validity of the biological opinion, substituting our judgment for that of FWS, the agency that Congress has determined in the ESA should be responsible for providing its expert opinion regarding whether the license amendment is likely to jeopardize the continued existence of the listed species, or to destroy or adversely modify its critical habitat.  The Commission is not responsible for reviewing the validity of the biological opinion.  Rather, when a biological opinion is prepared in the course of a Commission proceeding, the only means of challenging its substantive validity is on judicial review of the Commission's decision in the court of appeals.[58]  Therefore, a reviewing court, and not the Commission, must decide whether FWS considered the relevant factors and adequately explained its choices in the biological opinion.[59]

68.     As a licensing (or federal action) agency, our role is to ensure, in consultation with FWS, that the proposed action will not result in jeopardy to the species or adverse modification of its critical habitat.  In this context, as noted earlier, the ESA exerts a "powerful coercive effect" on agency action.  An agency that proceeds with an action in a manner that is inconsistent with the biological opinion runs the risk of having its action found to be arbitrary, capricious, and contrary to law.

69.     We believe our reliance on the biological opinion is reasonable and appropriate. The biological opinion includes a thorough analysis of the likely effects of implementing the Assistance Letter on the clubshell, fanshell, sheepnose, riffleshell, rayed bean, snuffbox, and rabbitsfoot mussels, and provides evidentiary support for the conditions and measures to be implemented.  We find nothing in the record to suggest that the

---

[57] In contrast, the reasonable and prudent measure that was set aside in the *Westlands Water District* case (n. 54 *supra*), on which the Protest Coalition relies, potentially required reallocating hundreds of thousands of acre-feet of water, with wide-ranging effects, and mandated new, significant action.  That is not the case here.  Further, even if we were to conclude that the measure would result in a major change, we would not reject it, because we treat the implementation of a reasonable and prudent measure as nondiscretionary.

[58] *See City of Tacoma, Washington v. FERC*, 460 F.3d 53, 75 (D.C. Cir. 2006).

[59] *United Water Conservation Dist.*, 129 FERC ¶ 61,244, at P 19 (2009).

**Attachment 1**

biological opinion is fatally flawed or that we should not rely on it, as the Protest Coalition argues. Moreover, the Commission may reasonably rely on the information and analysis that FWS provides in matters involving listed species, and need not conduct a detailed substantive review of a biological opinion before deciding whether to implement its conditions in connection with a proposed action.[60] We may appropriately rely on the opinion of FWS, and will satisfy our obligations under the ESA if the record supports that reliance and if the Protest Coalition can point to no new information that FWS did not take into account that would provide a basis for doubting that agency's conclusions.[61]

70.    The Protest Coalition's October 3, 2017 filing provides no new arguments, and FWS has had an opportunity to consider and respond to them. When urging an action agency to reject a biological opinion, it does not suffice to relitigate factual issues that the consulting agency already took into account. In these circumstances, the Commission may appropriately rely on FWS's biological opinion.

## C.    Amended Project Operation Compliance Plan

71.    NIPSCO's October 2, 2014 amendment application also included an amended Project Operation Compliance Plan pursuant to license Article 404.[62] Article 404 requires the plan to describe how NIPSCO would comply with the operational requirements set forth in license Article 403.[63] At a minimum, the plan must include the following provisions: (1) a description of all gages and other equipment, existing or to be installed; (2) collection of lake level and tailwater discharge data on an hourly basis; (3) procedures for recording, maintaining, and sharing project operation data; (4) a method to independently verify lake elevations; (5) a gage calibration plan for all gaging equipment included in the monitoring plan; and (6) a schedule for implementing the plan. The plan must also include provisions for emergency notification and incident reporting. On March 28, 2008, NIPSCO filed a Project Operation Compliance Plan that the Commission approved on August 18, 2008.[64]

---

[60] *City of Tacoma*, *Washington,* 109 FERC ¶ 61,198 (2004). *See also City of Tacoma, Washington*, 110 FERC ¶ 61,140 (2005).

[61] *See City of Tacoma, Washington, v. FERC,* 460 F.3d at 75-76.

[62] NIPSCO's October 2, 2014 Application at Exhibit E.

[63] *Northern Ind. Pub. Serv. Co.*, 121 FERC ¶ 62,009.

[64] *Northern Ind. Pub. Serv. Co.*, 124 FERC ¶ 62,135.

**Attachment 1**

72.     NIPSCO now proposes to amend its plan to include its proposed modified definition of "abnormal river conditions."

73.     We have reviewed the project license, as well as the proposed amended plan and the information provided by NIPSCO.  NIPSCO's amended plan relies on monitoring flows instead of reservoir levels.  Although monitoring reservoir elevations is typically the most effective way to monitor run-of-river conditions, NIPSCO maintains that it is unable to maintain a stable reservoir elevation due to its nearly 100-year-old equipment.[65] Its turbines are 1920 Francis-style units that operate efficiently over a relatively narrow range of flows.  Further, as relevant here, the Oakdale dam includes three types of spillways:  an auxiliary six-bay gated siphon-type spillway with a crest elevation of 610.10 feet NGVD; a two-gated service spillway with a crest elevation of 592.10 feet NGVD; and a concrete overflow spillway with a crest elevation of 615.50 feet NGVD. Given that the normal elevation of Lake Freeman is 612.45 ± 0.25 feet NGVD and the only ungated overflow spillway is at elevation 615.50 feet NGVD, none of the three spillways are suitable to serve as an ungated fixed crest overflow spillway.  As a result, in order to control the reservoir elevation precisely enough to maintain instantaneous run-of-river operations, the project would require relatively frequent manipulation of the gates at Oakdale dam.  No commenter objects to NIPSCO's proposed plan.  For these reasons, we agree that NIPSCO's proposed amended Project Operations and Compliance Plan is reasonable and should be approved.

### D.     National Historic Preservation Act

74.     Under section 106 of the National Historic Preservation Act (NHPA)[66] and its implementing regulations,[67] federal agencies must take into account the effect of any proposed undertaking on properties listed or eligible for listing in the National Register (defined as historic properties) and afford the Advisory Council on Historic Preservation a reasonable opportunity to comment on the undertaking.  This generally requires the Commission to consult with the State Historic Preservation Officer (SHPO) to determine whether and how a proposed action may affect historic properties, and to seek ways to avoid or minimize any adverse effects.

---

[65] *See* EA at C-10 (acknowledging NIPSCO's concerns regarding its aging equipment and stating that the Commission, if warranted, could modify license conditions or impose new conditions requiring the modernization and automation of older generating equipment).

[66] 16 U.S.C. § 470 et seq. (2012).

[67] 36 C.F.R. pt. 800 (2017).

**Attachment 1**

75.     As discussed in Commission staff's EA and above, operating the project in accordance with NIPSCO's amendment application and the Assistance Letter would lower Lake Freeman during abnormal low-flow events more than the staff alternative. More extensive drawdowns in Lake Freeman may expose inundated cultural resources, both documented and undocumented.  However, by email dated May 7, 2015, the Indiana SHPO stated that if these drawdowns are completed slowly, simulating natural flows, then impacts on archaeological resources would appear to be limited and similar to natural occurrences.[68]  The Indiana SHPO requested that it be notified during times of abnormal low-flow conditions.[69]  Given this consultation, Commission staff found in the draft EA that these drawdowns are not likely to adversely affect inundated cultural resources, and recommended that the licensee provide the requested notification.[70]

76.     This order includes Ordering paragraph (F) which requires the licensee to notify the Indiana SHPO within 30 days of the start of an abnormal low-flow event.

### E.     Water Quality Certification

77.     Under section 401(a)(1) of the Clean Water Act (CWA),[71] any applicant for a federal license or permit to conduct an activity which may result in a discharge into navigable waters must provide to the federal licensing or permitting agency a state certification that any such discharge will comply with the applicable provisions of the CWA.  The Commission may not issue or amend a license authorizing any such activity unless the state water quality certifying agency either has issued water quality certification for the project or has waived certification by failing to act on a request for certification within a reasonable period of time, not to exceed one year.  Section 401(d) of the CWA provides that the certification shall become a condition of any federal license that authorizes construction or operation of the project.[72]

---

[68] Indiana SHPO's May 7, 2015 Letter.

[69] *Id.*

[70] Draft EA at 6.

[71] 33 U.S.C. § 1341(a)(1) (2012).

[72] 33 U.S.C. § 1341(d) (2012).

**Attachment 1**

78.    Article 401 of the existing license requires NIPSCO to monitor dissolved oxygen (DO) levels to determine compliance with state DO standards and to devise corrective actions if needed.  There are no other license conditions relating to water quality.[73]

79.    For the license amendment, in its April 3, 2015, request for additional information, Commission staff advised NIPSCO that implementation of the Assistance Letter had the potential to draw down Lake Freeman and thus may result in a new discharge within the meaning of section 401 of the CWA.  Commission staff therefore directed NIPSCO to request a 401 water quality certification (WQC) from Indiana DEM and to file proof of the date Indiana DEM received the request within 30 days.

80.    NIPSCO contacted Indiana DEM regarding submission of a request for water quality certification on April 16, 2015, and held a meeting to discuss the Commission's directive on April 17, 2015.  During the meeting, Indiana DEM advised NIPSCO that a WQC would only be required and issued if the U.S. Army Corps of Engineers (Corps) determined that a permit was required under section 404 of the CWA.  Subsequently, on April 17, 2015, the Corps advised NIPSCO that, because the change would not involve a discharge of dredged or fill material, a section 404 permit was not required, and thus, a section 401 WQC would not be required.  By email dated April 29, 2015,[74] Indiana DEM advised that it will not require a section 401 WQC to modify the interim definition of "abnormal river conditions."

## F.    Section 10(a)(1) of the FPA

81.    Section 10(a)(1) of the FPA[75] requires that any project for which the Commission issues a license shall be best adapted to a comprehensive plan for improving or developing a waterway or waterways for the use or benefit of interstate or foreign commerce; for the improvement and utilization of waterpower development; for the adequate protection, mitigation, and enhancement of fish and wildlife; and for other

---

[73] The Indiana Department of Environmental Management (DEM) issued its water quality certification for licensing the project on March 24, 2005, more than one year from the date of NIPSCO's application.  Therefore, certification was deemed waived in the October 2007 license order.  *See Northern Ind. Pub. Serv. Co.,* 121 FERC ¶ 62,009 at PP 11-12, 26-27.  However, Commission staff determined that the certification conditions were consistent with the Article 401 requirements.

[74] *See* NIPSCO's May 1, 2015 response to Commission staff's additional information request at Appendix A.

[75] 16 U.S.C. § 803(a)(1) (2012).

**Attachment 1**

beneficial public uses, including irrigation, flood control, water supply, recreation, and other purposes. This standard continues to apply throughout the license term.[76]

82.     As discussed above, the FWS states that the purpose of the Assistance Letter is to identify dam operational measures that would create conditions for listed mussels that are sufficiently representative of natural run-of-river flow to avoid take of any listed mussels or adverse modification of critical habitat due to the project. Commission staff developed its alternative proposal to achieve what it determined would provide a better balance among competing resources under the FPA, by protecting not only mussels but other fish and wildlife, preserving lake levels for navigation and recreation, and preventing possible exposure of cultural resources present at the lake.[77]

83.     However, in striking an appropriate balance among competing resources under FPA section 10(a)(1), the Commission will give substantial weight to protecting ESA-listed species.[78] In any event, incidental take conditions are mandatory to avoid a prohibited taking under the ESA.[79] Therefore, while we believe that Commission staff's alternative discussed in the EA would provide a better balance of competing resources, we do not find the conditions of FWS's Assistance Letter and biological opinion to be inconsistent with section 10(a)(1) of the FPA.

## V.    **Conclusion**

84.     NIPSCO's proposed modified definition of "abnormal river conditions" was developed in consultation with FWS and Indiana DNR and would help protect federally-listed mussel species downstream of the Oakdale dam during low-flow conditions. Such operation would also lower Lake Freeman during low-flow periods and could adversely affect lake level-based recreation, as discussed above and in Commission staff's EA.

---

[76] *See, e.g., Montana Power Co.*, 62 FERC ¶ 61,166, at 62,138-39 (1993); *Pacific Gas and Elec. Co.*, 46 FERC ¶ 61,249, at 61,732 (1989).

[77] EA at vii.

[78] *See Merimil Limited Partnership,* 155 FERC ¶ 61,185, at P 74, *reh'g dismissed*, 157 FERC ¶ 61,089 (2016).

[79] In an analogous context, courts have observed that the Commission has no authority to reject or amend an agency's mandatory conditions under FPA section 4(e); rather, if the Commission determines that those conditions are inconsistent with the comprehensive development standard of FPA section 10(a)(1), the Commission's only recourse is to deny a license application. *See, e.g., Escondido Mutual Water Co. v. La Jolla Band of Mission Indians*, 466 U.S. 765, 777-78 & n.20 (1984); *City of Tacoma, Washington, v. FERC*, 460 F.3d at 67.

**Attachment 1**

Despite this, we approve the licensee's modified definition of abnormal river conditions and amend license Article 403 in ordering paragraph (B) because, as explained above, the definition is required under the ESA to authorize an otherwise prohibited take of endangered and threatened mussels.

85.    This order also approves NIPSCO's amended Project Operation and Compliance Plan and terminates the temporary variance issued on August 22, 2014.  NIPSCO must operate the project in accordance with license Article 403 and follow the terms and conditions of the incidental take statement included with FWS's July 6, 2017 biological opinion to ensure exemption from the take prohibitions of section 9 of the ESA.

86.    Therefore, these terms and conditions are attached to this order as Appendix A, and are incorporated in the project license by ordering paragraph (D).  So that the Commission remains informed about the use of these terms and conditions to protect federally-listed species, ordering paragraph (F) requires NIPSCO to file an annual report detailing the elevation/release data and duration for project operations that occurred during each abnormal low-flow event.

The Commission orders:

    (A)    Northern Indiana Public Service Company's application for amendment of license for the Norway-Oakdale Hydroelectric Project No. 12514, filed October 2, 2014, is approved.

    (B)    Article 403 is amended to define "abnormal river conditions" as: (1) conditions with river flows of 3,000 cubic feet per second (cfs) or higher, or hourly increases in river flow of 100 cfs or greater, at both project dams; (2) a 24-hour daily average of river flow of ≤ 300 cfs as measured at the USGS Winamac gage (no. 03331753); (3) in the event of an equipment or operation issue at Oakdale dam unrelated to weather conditions upstream, a 24-hour daily average of river flow of ≤ 570 cfs at the USGS Oakdale gage (no. 03332605); or (4) a 24-hour daily average of river flows of ≤ 410 cfs at the NIPSCO Buffalo Bridge gage.  Under "abnormal river conditions," as defined by river flow, the licensee must at all times act to maintain the fluctuation of the reservoir surface elevation within 0.75 feet above (rather than 0.25 feet under normal conditions) and 0.25 feet below elevation 647.47 feet NGVD for Lake Shafer and 0.75 feet above 612.45 feet NGVD for Lake Freeman.

    (C)    The temporary variance from the minimum reservoir elevation under license Article 403 that was granted by the Commission on August 22, 2014, is terminated.

    (D)    This license is subject to the reasonable and prudent measure and its implementing incidental take terms and conditions of the biological opinion submitted by

**Attachment 1**

the U.S. Fish and Wildlife Service under section 7 of the Endangered Species Act, as those conditions are set forth in Appendix A to this order.

(E)     Northern Indiana Public Service Company's amended Project Operation Compliance Plan filed October 2, 2014, pursuant to Article 404 of the project license, is approved.

(F)     The licensee must notify the Indiana State Historic Preservation Office within 30 days of each abnormal low-flow event.  In addition, the licensee must file an annual report with the Commission by January 31 describing all abnormal low-flow events.  Each annual report must include:

    a.  the beginning and end dates of each abnormal low-flow event as defined by the low flow plan within the U.S. Fish and Wildlife Service's (FWS) Technical Assistance Letter;

    b.  flow release data from Norway and Oakdale dams and fluctuations in reservoir elevations during each abnormal low-flow event;

    c.  the relevant USGS gage (or NIPSCO gage, upon approval by FWS) readings, including those used to determine the 24-hour daily average flows;

    d.  the recorded 24-hour daily average flows;

    e.  the measures taken to implement the abnormal low flow plan and their beginning and end times;

    f.  any problems associated with implementation of the abnormal low flow plan protocols;

    g.  any deviations from the abnormal low flow plan protocols, and;

    h.  the magnitude and duration of any conditions that deviate from the normal flow requirements of Article 403.

**Attachment 1**

Project No. 12514-074                                                                                          -29-

    (G)    This order constitutes final agency action.  Any party may file a request for rehearing of this order within 30 days from the date of its issuance, as provided in section 313(a) of the FPA, 16 U.S.C. § 825*l* (2012), and section 385.713 of the Commission's regulations, 18 C.F.R. § 385.713 (2017).

By the Commission.

( S E A L )

                                    Nathaniel J. Davis, Sr.,
                                      Deputy Secretary.

**Attachment 1**

## APPENDIX A

## Reasonable and Prudent Measure and Terms and Conditions included in the U.S. Fish and Wildlife Service's Biological Opinion for the Norway-Oakdale Hydroelectric Project No. 12514

## Filed July 6, 2017

## EFFECT OF THE TAKE

In the accompanying biological opinion, the Service determined that this level of anticipated take is not likely to result in jeopardy to the species or destruction or adverse modification of critical habitat.

## AMOUNT OR EXTENT OF TAKE ANTICIPATED

Implementation of the proposed FERC action would result in take at the levels described in Table 4 [below], and at the frequencies described in the accompanying text. This level of take would occur without implementation of the reasonable and prudent measure, which is described in the next section.

**Table 4**

| CFS | Affected Habitat (m²) | Mussel Take/ (m²) | | | |
|-----|----------------------|-------------------|---|---|---|
|     |                      | Clubshell (0.001) | Fanshell (0.0013) | Sheepnose (0.002) | Rabbitsfoot (0.003) |
| 500 | 0       | 0   | 0   | 0   | 0    |
| 400 | 74,227  | 74  | 96  | 148 | 223  |
| 300 | 157,733 | 158 | 205 | 315 | 473  |
| 150 | 436,085 | 436 | 567 | 872 | 1308 |

## REASONABLE AND PRUDENT MEASURE

**Attachment 1**

The Service believes the following reasonable and prudent measure is necessary and appropriate to minimize impacts of incidental take of clubshell, fanshell, sheepnose, and rabbitsfoot mussels.

- Minimize take of listed mussel by restoring a more natural flow regime downstream of Oakdale dam during low-flow periods.

**TERMS AND CONDITIONS**

- Adopt the alternative proposed by NIPSCO in its request for a license amendment and implement the Service TAL of 2014 as clarified (Appendix 1).

- Replace readings from the USGS Winamac Gauge with those from the USGS Buffalo Gauge as the key metric defined in the TAL upon authorization of the USGS Buffalo Gauge by the Service.

**Attachment 1**

Project No. 12514-074

**APPENDIX B**

**U.S. Fish and Wildlife's Technical Assistance Letter and Clarifications**

**Attachment 1**



# United States Department of the Interior
## Fish and Wildlife Service



Bloomington Field Office (ES)
620 South Walker Street
Bloomington, IN  47403-2121
Phone: (812) 334-4261 Fax: (812) 334-4273

August 13, 2014

Mike Finissi
Sr. VP & Chief Operating Officer of NIPSCO Operations
NIPSCO
801 E. 86th Avenue
Merrillville, IN 46410

Re: Technical Assistance Letter (TAL)

Dear Mr. Finissi:

The purpose of this TAL is to acknowledge and respond to Northern Indiana Public Service
Company's (NIPSCO's) request for technical assistance dated 13 August 2014 concerning the
effects of NIPSCO's Oakdale Hydro Project on Endangered Species Act (ESA)-listed species
under the jurisdiction of the U.S. Fish and Wildlife Service (USFWS or Service).

**Background**

The Oakdale Dam is a hydroelectricity generating facility across the Tippecanoe River
constructed in the 1920s and owned by NIPSCO.  It is licensed by the Federal Energy
Regulatory Commission (FERC).  Along with its sister dam upstream (the Norway Dam), it
impounds two in-line reservoirs, Lakes Shafer and Freeman.  The presence of the Oakdale Dam
and Norway Dam, including various operational protocols and certain regulatory constraints on
the dams, can affect the volume of water and hydrograph of the Tippecanoe River downstream of
the Oakdale Dam to its confluence with the Wabash River.  Occasionally, the Tippecanoe
watershed experiences drought conditions, which can lead to low water flow conditions in the
Tippecanoe River.

Section 9(a)(1)(B) of the ESA, 16 U.S.C.§ 1538 (a)(1)(B), and 50 C.F.R. § 17.31, protect against
the unlawful "take" of an endangered species.  "Take" is defined by the ESA as to "harass, harm,
pursue, hunt, shoot, wound, kill, trap, capture, or collect, or attempt to engage in any such
conduct" 16 U.S.C. § 1532(19).  Section 7(a)(2) of the ESA requires federal agencies to confer
with the Secretary to ensure that their actions will not jeopardize the continued existence of or
destroy or adversely modify the critical habitat of an endangered or threatened species. The ESA

**Attachment 1**

defines critical habitat as (i) the specific areas within the geographical area occupied by the species, at the time it is listed in accordance with the provisions of section 4 of the ESA, on which are found those physical or biological features (I) essential to the conservation of the species and (II) which may require special management considerations or protection and (ii) specific areas outside the geographical area occupied by the species at the time it is listed in accordance with the provisions of ESA section 4, upon a determination by the Secretary that such areas are essential for the conservation of the species.

There are six ESA-listed mussels in the Tippecanoe River: clubshell (*Quadrula cylindrica*), fanshell (Cyprogenia stegaria), sheepnose (*Plethobasus cyphyus*), rayed bean (*Villosa fabalis*), snuffbox (*Epioblasma triquetra*), and rabbitsfoot (*Quadrula cylindrica cylindrica*) and an extensive along with a diverse community of other unlisted mussels extant in the approximately 18-mile reach between the Oakdale Dam and the confluence of the Tippecanoe and Wabash Rivers. ESA critical habitat has also been proposed for the rabbitsfoot mussel in the Tippecanoe River and is currently under review (Figure 1).

The influence of the Oakdale Dam on the Tippecanoe River manifest in at least two important ways with respect to mussels. First, low water may expose mussel habitat to vulnerable conditions, particularly during periods of sustained low precipitation. Second, a hydrograph measured downstream of the Oakdale Dam can be much different than one measured upstream. Specifically, there are swings in the amount of flow that are more frequent than the Service would expect under "natural" conditions. Fluctuations of several hundred cfs can occur (occasionally multiple times) within a 24-hour period. ESA-listed mussels are poorly adapted to this level of instability especially during low to moderate flows.

The Indiana Department of Natural Resources, Division of Fish and Wildlife (IDNR) and the Service documented mortality of listed mussels related to low flows in the Tippecanoe River, downstream of the Oakdale Dam in 2012 and a second mussel die-off in 2013. Rapid changes in flow, whether naturally occurring or induced by man, can affect mussels by reducing available habitat, by limiting flow refuges where mussels often occur[1], by causing mussels to be dislodged and transported to less suitable or ecological sink habitat, and by contributing to sediment in the river, which can interfere with reproduction and disrupt the parasitic stage of mussels. Low flows and rapid changes in flow effects can meet the definition of take (see above) including harm and kill.

The purpose of this TAL is to identify dam operational measures which the Service believes will, if implemented, create conditions for ESA-listed mussels sufficiently representative of natural run-of-the-river water flow so as to eliminate take of any ESA-listed mussel or adverse modification of critical habitat (should it be designated) due to the Oakdale Dam.

---

[1] See Strayer, David L. 1999. Use of flow refuges by unionid mussels in rivers. *Journal of the North American Benthological Society* 18:4, pp.468-476

**I  Key Concepts**

- *Suitable habitat* for mussels occurs in shallow (and deep) microhabitats of rivers. Suitable, but *vulnerable habitat* (shoals, riffles, and other shallow habitats) under "natural" conditions exist below a generally consistent minimum elevation and provide stable habitat for mussels except during unusually dry years. Best available data indicate flows of approximately 500 cfs, as measured at the USGS Delphi gauge, roughly define the boundary between stable but vulnerable mussel habitat and *ephemeral habitat* that is likely downstream of the Oakdale Dam.[2]

- In addition to minimum flows, a stable flow regime during low-moderate flow is necessary to avoid take of mussels or impacts to mussel habitat.[3]

- Run-of-the-river during abnormal low flow conditions will be defined differently from run-of-the-river for the Oakdale Dam under license from FERC during normal flow conditions. During abnormal low flow ("ALF") conditions, the Oakdale Dam will be managed to achieve run-of-the-river operations that are based on a flow regime downstream of the Oakdale Dam discounting the influence of the dams and reservoirs. It is based on best available data and science looking at flows and flow regime upstream of the dams to estimate downstream flows as described more fully in Section II below.

- Linear Scaling[4] is the approach the Service and NIPSCO have used for this TAL to determine an approximation of run-of-the-river during ALF conditions. In sum, the Service and NIPSCO used Linear Scaling to predict that in a comparatively homogenous watershed (i.e., one without large changes in elevation, large urban areas, or major differences in land cover) flow in sub-watersheds scale to one another linearly. Simply put, if the above conditions prevail, a point in a river where the watershed is twice the area will have twice the flow as a point in the river upstream where the watershed is half the area (Figure 2).[5]

---

[2] The recommended numbers are based on several different sets of information. The information includes: observations and data gained during and immediately after the 2012 drought by IDNR and Service biologists; records of flows from the Oakdale Dam and the USGS gauges; time-lapse images at three vulnerable sites; observations by the IDNR mussel biologist and a Service biologist on the Tippecanoe River during 2013; observations made by NiSource/NIPSCO biologists, IDNR biologists, Service biologists and others during a trial of the ALF. See NIPSCO Submittal to FERC 20140430-5304 Attachment C: US Fish & Wildlife Service Response to FERC Data Request #2

[3] These low-flow periods often correspond to "active" periods for mussels (reproduction, dispersal, etc.).

[4] See Galster, J.C., et al. 2007. Effects of urbanization on watershed hydrology: the scaling of discharge with drainage area. *Geology* 34:9, pp. 713-716; and Galster, J.C. 2007. Natural and anthropogenic influences on the scaling of discharge with drainage area for multiple watersheds. *Geosphere* 3:4, pp. 260-271.

[5] In this case we have multiple USGS gauges on the Tippecanoe River, some above the influence of the dams and some below that provide us with years of accurate flow measurements. Knowing that the watershed area at the USGS Winamac gauge is very nearly half the size of the watershed at the USGS Oakdale gauge allows use of the USGS Winamac gauge data (above the influence of the dams) to predict what the flow downstream of the dam would be were the dams and lakes not influencing that flow.

**Attachment 1**

- In periods of ALF, mussel mortality is a possibility despite the implementation of the ALF operating protocols described in Section II below, however, because the run-of-the-river operations implemented during ALF conditions replicates what would be expected if the dams and reservoirs were not in place, mussel mortality by definition would not be a take because it is not caused by the applicant.

## II  TAL Requirements / ALF Plan

*Overview of ALF Plan*

The applicant and Service have developed the below-detailed set of conservative dam operating protocols (the "ALF Plan") which will be implemented during periods of ALF to protect against any take of ESA-listed mussels on the Tippecanoe River below the Oakdale Dam. The ALF Plan involves two primary actions: 1) early recognition of ALF events potentially harmful to mussels that will trigger the temporary cessation of power generation at the Oakdale Dam; and 2) subsequent release of water from the Oakdale Dam during ALF events that best matches the run-of-the- river as defined for ALF conditions based on linear scaling from the USGS Winamac gauge (USGS gauge 03331753).[6] This matching of the scaled-up USGS Winamac gauge flows will continue until the USGS Winamac gauge again reaches a 24-hour average above 300 cfs.

In addition, to avoid large fluctuations in downstream flow when mussels are especially vulnerable to such changes, NIPSCO will preclude spikes (hourly readings) below 500 cfs as measured at the USGS Oakdale gauge (USGS Gauge 03332605) from occurring at anytime during normal flows.

*Initiation and Close of ALF Plan Protocols*

The ALF Plan will be initiated by the onset of an ALF event, which is defined as either:

a.  24-hour daily average of ≤ 300 cfs at the USGS Winamac gauge; or
b.  24-hour daily average ≤ 600 cfs at the USGS Oakdale gauge.

NIPSCO will check the USGS calculated and published 24-hour daily average for the previous day at both the USGS Oakdale and USGS Winamac gauges and determine whether or not an ALF event has begun.  If an ALF event is identified, NIPSCO will implement the ALF Plan protocols immediately.

Use of the USGS Winamac gauge to determine when an ALF event begins is expected to provide NIPSCO sufficient lead time to implement the ALF Plan protocols to avoid take of ESA-listed or proposed mussels or adverse modification of critical habitat.  Monitoring of the USGS Oakdale

---

[6] Should another USGS gauge or other gauge of comparable reliability be installed on the Tippecanoe River downstream of the USGS Winamac gauge and a point upstream of the influence of Norway Dam, the Service and NIPSCO can mutually agree to amend the TAL to incorporate data from that gauge to supplement or replace data from the USGS Winamac gauge.

**Attachment 1**

gauge will provide for the same protection of mussels and critical habitat should a dam operation action or problem (e.g., gate stuck closed) not associated with upstream weather reduce flows downstream of the dam.

An ALF event ends when the USGS calculated 24-hour daily average is > 300 cfs as measured at the USGS Winamac gauge and hourly readings at USGS Oakdale gauge read > 500 cfs. The ALF Plan protocols need not be continued once an ALF event ends. Use of the 300 cfs 24-hour daily average at the USGS Winamac gauge to determine when an ALF event ends is expected to ensure that flows have stabilized, signaling that operations can return to normal without causing any take.

For all ALF Plan protocols, USGS calculated and published 24-hour daily averages will be used.

*Implementation of ALF Protocols*

### Protocol 1 – Recognizing Potential ALF Conditions and Ceasing Generation

NIPSCO will monitor flows at USGS Winamac and USGS Oakdale gauges. As flow is trending downward and approaching 300 cfs or 600 cfs, respectively, NIPSCO will implement the following steps to stop any generation at the Oakdale Dam facilities:

1. NIPSCO Operations will contact NIPSCO Generation Dispatch and inform them that all Oakdale units are being taken off line to comply with the ALF Plan.

2. NIPSCO Operations will adjust flood and trash gates in combination with stopping any operating unit to maintain a steady discharge flow

3. Discharge flow will be controlled using a combination of flood and trash gates to control USGS flows per TAL requirements (see Protocol 2)

4. When the USGS Winamac gauge 24 hour daily average is > 300 cfs, NIPSCO Operations may reestablish generation and adjust downstream flows in compliance with the FERC license.

These actions are expected to help reduce the large swings in flow out of Oakdale Dam because the Service believes that engaging the turbines affects the flow through the dam.

### Protocol 2 – Water Release from Oakdale Dam Matching Run-of-the-River during ALF conditions.

1. Confirm that the 24-hour daily average at the USGS Winamac gauge is ≤ 300 cfs or the 24-hour daily average at the USGS Oakdale gauge is ≤ 600 cfs;

2. Calculate the 'run-of-the-river during ALF' discharge rate for the Oakdale Dam (1.9 times the flow of the previous 24-hour daily average flow measured at the USGS Winamac gauge);

**Attachment 1**

3. Calculate maximum and minimum percent flow thresholds as specified in the TAL;

4. Adjust trash and flood gates in combination to match calculated flow;

5. Record hourly flow data at USGS Oakdale gauge and adjust trash and flood gates as needed to maintain flow within specified limits;

6. By monitoring the flows rates at USGS Winamac (24-hour daily average) and Oakdale gauges (hourly), determine when ALF period ends;

7. Then adjust flows from the NIPSCO Oakdale Dam to be in compliance with the then-current FERC license.

Flows will be maintained during ALF events as measured at the USGS Oakdale gauge that are at least 1.9 times the previous 24-hour daily average flow measured at the USGS Winamac gauge.[7]

*Periodic Formal Review*

The Service considers the protocols of this TAL to be preliminary in that such shall be re-evaluated after December of the first year that ALF Plan protocols are implemented. At the conclusion of that year, the Service will review implementation of the ALF Plan protocols described herein. Provided NIPSCO has complied with the requirements listed in this TAL and the process is working as expected (e.g., downstream flows are consistent with linear scaling predictions), the Service intends to subsequently issue a multi-year TAL. Upon issuance of a multi-year TAL, a formal review of the TAL will occur between the Service and NIPSCO four years from issuance, and subsequently every five years thereafter. This review will assess process, procedures, and compliance, and will use the best available data at the time of the review to evaluate the effectiveness of the ALF Plan on the federally listed mussels and their habitats downstream of the Oakdale Dam. It is the intention of the Service to reissue the TAL subsequent to the formal reviews provided the compliance record is satisfactory, mussels and their habitats (including critical habitat, should it be designated) remain protected, and NIPSCO requests reissuance. New information (e.g., delisting of species) could result in a review of the TAL in the interim.

**III  Compliance**

Compliance with the ALF Plan will be defined as NIPSCO accomplishing each relevant item listed in (a), (b), (c), and (e) below during every ALF event and (d) below during normal flows.

---

[7] The previous 24-hour daily average is used because we estimate that there is on average an approximately 24-hour lag time between the USGS Winamac and Oakdale gauges. This is based on evaluation of flows during the summer of 2013 between the USGS Delphi gauge and three downstream cameras placed by the Service and NIPSCO to evaluate the impacts of various flows on mussels and mussel habitat.

**Attachment 1**

   a.  ceasing electric power generation at the Oakdale Dam when the 24-hour daily average at
       the USGS Winamac gauge is ≤ 300 cfs or the 24-hour daily average at the USGS
       Oakdale gauge ≤ 600 cfs;
   b.  discharging 1.9 times the flow of the previous 24-hour daily average flow measured at
       the USGS Winamac gauge out of the Oakdale Dam as measured at the USGS Oakdale
       gauge;
   c.  continuing the ALF Plan protocols until the 24-hour daily average at the USGS Winamac
       gauge is > 300 cfs;
   d.  maintaining flow above 500 cfs as measured hourly at the USGS Oakdale gauge.
   e.  meeting all monitoring and reporting requirements (detailed below).

The Service recognizes that the ALF Plan protocols have not been previously implemented and
there may be an initial period of training, calibrating equipment, etc.[8] In order to address
mechanical and other challenges inherent in implementing new procedures, provisional
compliance requirements may be adhered to by NIPSCO during the first ALF event.

The provisional compliance requirements are as follows:

   a.  Discharge from the Oakdale Dam will be a maximum of 15 percent above and 15 percent
       below 1.9 times the 24-hour daily average flow at the USGS Winamac gauge as
       measured at the USGS Oakdale gauge on Days 1 and 2. Discharge from the Oakdale
       Dam may exceed the target of 15 percent above 1.9 times the 24-hour daily average flow
       at the USGS Winamac gauge as measured at the USGS Oakdale gauge if required by
       operating emergencies beyond the control of NIPSCO, such as flood or abnormal high
       flow conditions (as defined in the FERC license), that may arise during the measurement
       period.
   b.  Discharge from the Oakdale Dam will be a maximum of 15 percent above and 10 percent
       below on Days 3 to 5. Discharge from the Oakdale Dam may exceed the target of 15
       percent above 1.9 times the 24-hour daily average flow at the USGS Winamac gauge as
       measured at the USGS Oakdale gauge if required by operating emergencies beyond the
       control of NIPSCO, such as flood or abnormal high flow conditions (as defined in the
       FERC license), that may arise during the meaurement period.
   c.  Discharge from the Oakdale Dam will be a maximum of 15 percent above and 5 percent
       below for the remainder of the first ALF period. Discharge from the Oakdale Dam may
       exceed the target of 15 percent above 1.9 times the 24-hour daily average flow at the
       USGS Winamac gauge as measured at the USGS Oakdale gauge if required by operating
       emergencies beyond the control of NIPSCO, such as flood or abnormal high flow
       conditions (as defined in the FERC license), that may arise during the measurement
       period.

---

[8] Note that the Service expects NIPSCO to test the ALF Plan protocols prior to an ALF event if practical to avoid
possible problems.

**Attachment 1**

    d.  No more than three (3) spikes ( hourly readings) below 500 cfs measured at the USGS
        Oakdale gauge can occur during the first six months after the TAL is issued.

If the first ALF event is brief (less than the five days of provisional compliance) NIPSCO may
inform the Service and implement a second consecutive provisional period and still be in
compliance.

If at the end of the first full ALF event (or two consecutive abbreviated periods) the provisional
targets have not been met, the result will be a meeting between NIPSCO and the Service within
two weeks to evaluate compliance problems.  At that point, provided there are revised
compliance procedures in place and both parties agree, another provisional period can be
implemented during the next ALF event.  If agreement cannot be reached on revised procedures,
NIPSCO can temporarily remain in provisional compliance by releasing a minimum of 500 cfs
from the Oakdale Dam as measured hourly at the USGS Oakdale gauge for one additional ALF
event only while revised procedures are developed and a second provisional period is
implemented.  If agreement cannot be reached by the conclusion of the second full ALF event,
NIPSCO and the Service will meet within one month and the Service will subsequently
determine whether or not the TAL can remain in effect. Compliance other than during this
(these) provisional period (s) will require maintaining flow within, and including, 15 percent
above and 5 percent below 1.9 times the 24-hour daily average flow at the USGS Winamac
gauge as measured at the USGS Oakdale gauge for every 24-hour period of every ALF event[9].
In addition, compliance will require flows be $\geq$ 500 cfs measured hourly at the USGS Oakdale
gauge during normal river flows.The Service recognizes that third parties outside of NIPSCO's
control may, from time to time, cause unanticipated water withdraws from the river downstream
of the USGS Winamac gauge but upstream of the USGS Oakdale gauge, and those third party
withdraws may result in flows at or below 600 cfs at the USGS Oakdale gauge notwithstanding a
measured 24-hour daily average flow above 300 cfs at the USGS Winamac gauge. Compliance
with the TAL does not include a requirement for NIPSCO to police third parties. Recognition of
this, however, does not absolve NIPSCO of complying with the requirements of the TAL. The
Service also recognizes that in the event of a flood or other operating emergency, NIPSCO will
take actions necessary to protect the Oakdale Dam facilities and surrounding communities
including, but not limited to, releasing water at a rate more than that specified above.  The
Service also recognizes that NIPSCO's existing FERC license requirements applicable to
abnormal high flows do not employ a 24-hour average and therefore, NIPSCO may need to take
action to release water at a rate higher than the rate specified above to comply with the
requirements of Article 403 of the FERC license during abnormal high flow conditions.

---

[9] The Service recognizes that NIPSCO will need to rely on the USGS gauges as part of the compliance protocols.  If
the USGS gauges identified herein are not functioning properly or timely updates to the USGS websites are not
made for any reason, the Service will not hold NIPSCO accountable for acting in good faith in accordance with data
from USGS gauges.  NIPSCO will use the NIPSCO gauges for compliance if it determines USGS gauges are not
functioning properly.  Under these circumstances, NIPSCO can also choose to coordinate with the Service.

**Attachment 1**

## IV  Monitoring and Reporting

### *Monitoring*

NIPSCO will monitor the USGS Winamac and USGS Oakdale gauges daily and download the USGS 24-hour daily average flows each day as defined above.

NIPSCO will also monitor the USGS Delphi gauge, NIPSCO Oakdale gauge, Freeman lake level, Dissolved $O_2$ levels, whether the Oakdale Dam generation is on/off, gate positions, and any changes made in operation.

The Service will oversee structured monitoring of a minimum of three sites downstream of the Oakdale Dam during the first four years of the TAL. The results of this study will be used as one component to assess the effectiveness of the TAL (ALF Plan protocols). IDNR will lead this effort in coordination with the Service and develop protocols specifically to assess federally listed mussels and any vulnerable mussel critical habitat designated downstream of the Oakdale Dam.[10]

### *Reporting*

NIPSCO will provide an informal notice to the Service within three business days after the completion of an ALF event. In addition, NIPSCO will provide to the Service an Annual Report by 31 March of each project year detailing all of the ALF events that occurred during the prior calendar year. Reports will contain at minimum:

a. the beginning and end date of each ALF event;
b. the relevant USGS gauge readings including those used to determine the 24-hour daily averages;
c. the recorded 24-hour daily averages;
d. all measures that were implemented and when each began and ended;
e. any problems associated with implementation.
f. any deviations from ALF Plan protocols necessitated by emergency conditions as described above in this document.

By April 30 at the conclusion of each 5-Year TAL period, an in-person meeting between the Service and NIPSCO will occur to ensure that the TAL continues to be efficient and effective in avoiding take of federally listed mussels downstream of the Oakdale Dam.

## V  Determination

The Service has reviewed the information NIPSCO has provided regarding the presence of the aforementioned ESA-listed mussels and their habitat downstream of the Oakdale Dam, and the

---

[10] Note that this is not compliance and will used by the Service and NIPSCO at the first 5-Year meeting to determine if revisions are needed to the TAL to ensure NIPSCO is avoiding take by properly implementing the TAL.

**Attachment 1**

measures set forth under the ALF Plan that NIPSCO intends to implement to best avoid any potential take of such species and their habitat. Based on Service's review of this information, the ALF Plan including, measures to maintain natural run-of-the-river flows and preclude large swings in flow during low flow periods, will serve to address Service concerns with respect to take of federally-listed mussels in the Tippecanoe River downstream of the Oakdale Dam from adverse impacts associated with the Oakdale and Norway Dams. That is, compliance with the ALF Plan is anticipated to result in river conditions during ALF events sufficiently equivalent to those afforded by nature. Consequently, if operated in accordance with the ALF Plan, the Service will presume that the Oakdale Dam will not serve as a cause of any take of the downstream listed mussel population or habitat.

This office is not authorized to provide guidance in regards to the Service Office of Law Enforcement (OLE) investigative priorities involving federally listed species. However, we understand that OLE carries out its mission to protect ESA-listed species through investigation and enforcement, as well as by fostering relationships with individuals, companies, and industries that have taken effective steps to avoid take of listed species, and by encouraging others to implement measures to avoid take of listed species. It is not possible to absolve individuals or companies from liability for unpermitted takes of listed species, even if such takes occur despite the implementation of appropriate take avoidance measures. However, the Office of Law Enforcement focuses its enforcement resources on individuals and companies that take listed species without identifying and implementing all reasonable, prudent and effective measures to avoid such takes. As of this date, Bloomington Field Office concludes that the proposed project will not or is unlikely to result in take of ESA listed species and based on preliminary identification of critical habitat for rabbitsfoot mussels, would avoid adverse modification of critical habitat should it be designated for rabbitsfoot mussel. It will be necessary to evaluate this preliminary determination should designation of critical habitat occur.

**Conclusion**

We appreciate NIPSCO's efforts to coordinate with our office in determining what measures can be implemented to avoid take of any ESA-listed species or their habitat at the project site. Should new information become available, we request that NIPSCO promptly notify the Service. Please contact me at (812) 334-4261 or scott_pruitt@fws.gov if you have any questions.

Sincerely,

Scott E. Pruitt
Field Supervisor

**Attachment 1**

**Definitions**

*Ephemeral Habitat* – for this TAL this is habitat that mussels may occupy, but that under natural run-of-the-river conditions would be exposed for periods of time in most years sufficient to kill virtually all mussels living there. Mussels may occupy this habitat opportunistically (e.g., mussels carried to higher elevation sites during high flows).

*Suitable Habitat* – for this TAL mussel habitat that under natural run-of-the-river conditions would remain sufficiently wet for multiple years to allow mussels to survive and permit growth, reproduction, and other aspects of mussel life history to be completed.

*Vulnerable Habitat* – for this TAL this is suitable mussel habitat occurring on higher elevation substrates within the Tippecanoe channel – these sites include shoals, bars, and shoreline edge. They are vulnerable because they are the first sites exposed as cfs and associated water level in the river drops. A number of the likely covered species (e.g., rayed bean, snuffbox, rabbitsfoot, and sheepnose) typically or often occupy these sites.

**Attachment 1**

Figure 1 – Map of Unit RF26 of Proposed Critical Habitat for Rabbitsfoot Mussel

Figure 2 – Hypothetical Example of Linear Scaling



24027-0193

CH2M4928603.1

**Attachment 1**

# 19-1066
# ATTACHMENT 2

166 FERC ¶ 61,030
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Before Commissioners:  Neil Chatterjee, Chairman;
                       Cheryl A. LaFleur, Richard Glick,
                       and Bernard L. McNamee.

Northern Indiana Public Service Company LLC          Project No. 12514-085

ORDER DENYING REHEARING

(Issued January 17, 2019)

1.      On June 21, 2018, the Commission issued an order amending Northern Indiana
Public Service Company LLC's (NIPSCO) license for its Norway-Oakdale Hydroelectric
Project No. 12514 (Norway-Oakdale Project), located on the Tippecanoe River in Carroll
and White counties, Indiana.[1]  The Order Amending License modified license Article 403's
definition of "abnormal river conditions," approved a revised operation compliance plan,
and terminated a temporary variance.  On July 19, 2018, Shafer and Freeman Lakes
Environmental Conservation Corporation, together with Carroll County, Indiana; White
County, Indiana; and the City of Monticello, Indiana (collectively, Protest Coalition) filed a
timely request for rehearing.  This order denies rehearing.

I.      **Background**

2.      On October 2, 2007, Commission staff issued a 30-year license to NIPSCO to
maintain and operate the Norway-Oakdale Project.[2]  The Norway-Oakdale Project is located
on a 19-mile segment of the Tippecanoe River.  The project consists of two developments
(including dams, reservoirs, and powerhouses) with a combined generating capacity of 16.4
megawatts (MW):  the upper Norway development and the lower Oakdale development.

3.      The Norway development includes:  a 915-foot-long dam; a powerhouse equipped
with four generating units with a total authorized installed capacity of 7.2 MW; and the
1,291-acre Lake Shafer, which extends 10 miles upstream of Norway dam.  The Oakdale
development includes:  a 1,688-foot-long dam; a powerhouse equipped with
three generating units with a total authorized installed capacity of 9.2 MW; and the 1,547-
acre Lake Freeman, which extends 10 miles upstream of Oakdale dam.

_____

[1] *N. Ind. Pub. Serv. Co. LLC*, 163 FERC ¶ 61,212 (2018) (Order Amending License).

[2] *N. Ind. Pub. Serv. Co.*, 121 FERC ¶ 62,009 (2007).

**Attachment 2**

### A. Project Operation

4. License Article 403 requires NIPSCO to operate both developments in an instantaneous run-of-river mode, to the maximum extent practicable. Under run-of-river operation, outflow from the Norway dam approximates the sum of inflows to Lake Shafer and the outflow from the Oakdale dam approximates the sum of inflows to Lake Freeman. Further, Article 403 requires NIPSCO to maintain Lake Shafer within 0.25 feet above and below elevation 647.47 feet National Geodetic Vertical Datum (NGVD) and Lake Freeman within 0.25 feet above and below elevation 612.45 feet NGVD.

5. Article 403 allows NIPSCO to temporarily modify run-of-river operations and reservoir elevations during "abnormal river conditions." Article 403 provides an interim definition for "abnormal river conditions," stating that these were conditions with river flows of 3,000 cubic feet per second (cfs) or higher, or an hourly increase in river flow of 100 cfs or greater at both project dams. During such abnormal river conditions, Article 403 requires NIPSCO at all times to maintain Lake Shafer within 0.75 feet above and 0.25 feet below elevation 647.47 feet NGVD, and Lake Freeman within 0.75 feet above and 0.25 feet below elevation 612.45 feet NGVD. Article 403 does not allow the licensee to temporarily modify operations during low-flow conditions without the Commission granting a variance.

6. License Article 405 states that within five years of license issuance NIPSCO must propose a permanent definition of "abnormal river conditions" developed in consultation with the U.S. Fish and Wildlife Service (FWS) and the Indiana Department of Natural Resources.

7. Beginning in the summer of 2012, northern Indiana experienced severe droughts that resulted in mussel mortality in the Tippecanoe River downstream of the Oakdale dam, including the sheepnose, clubshell, and fanshell species, which were federally-listed as endangered under the Endangered Species Act (ESA), and the rabbitsfoot, which was unlisted at that time.[3] As a result, during the summer of 2012, FWS recommended that NIPSCO release a minimum flow of 200 cfs from the Oakdale dam to avoid the take of federally-listed mussels.[4]

8. While maintaining the FWS-recommended 200-cfs flow, NIPSCO fell out of compliance with license Article 403's requirement to maintain run-of-river operation – the

---

[3] Rabbitsfoot mussels were listed as threatened under the ESA on September 17, 2013.

[4] FWS' July 17, 2012 Filing (Accession No. 20120717-0022). The term "take" means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or attempt to engage in any such conduct. 16 U.S.C. § 1532(19) (2012).

outflows from Oakdale dam exceeded inflows to Lake Freeman, causing the surface elevation of Lake Freeman to fall below 612.20 feet NGVD.[5]

9. Consequently, between August 2012 and 2014, NIPSCO requested temporary variances of license Article 403[6] and an extension of time to comply with Article 405's requirement to develop a permanent definition of "abnormal river conditions." Commission staff approved NIPSCO's requests for temporary variances during this time.[7]

10. On August 13, 2014, FWS issued a Technical Assistance Letter (Assistance Letter) to NIPSCO, identifying dam operation measures that FWS stated would mimic natural run-of-river conditions in order to avoid project-induced take of federally-listed mussels and avoid adverse modification of critical habitat attributable to project operation.[8] The Assistance Letter set forth an abnormal low-flow plan that is triggered by an abnormal low-flow event.[9] When an abnormal low-flow event occurs, NIPSCO must stop generation at the Oakdale development and release 1.9 times the flow of the previous 24-hour daily average flow measured at the Winamac gage, or 500 cfs, whichever is less. The abnormal low-flow event ends when the 24-hour daily average flow is greater than 300 cfs at the Winamac gage and greater or equal to 500 cfs at the Oakdale gage. The Assistance Letter does not affect operations at the Norway development.

---

[5] A more detailed description of drought events and procedural history appears in the Order Amending License, 163 FERC ¶ 61,212 at PP 10-18.

[6] NIPSCO August 3, 2012 Filing (Accession No. 20120803-5042).

[7] *N. Ind. Pub. Serv. Co.*, 141 FERC ¶ 62,012 (2012); *N. Ind. Pub. Serv. Co.*, 143 FERC ¶ 62,043 (2013); *N. Ind. Pub. Serv. Co.*, 148 FERC ¶ 62,156 (2014).

[8] *See* Order Amending License, 163 FERC ¶ 61,212 at Appendix B. FWS issued three clarifications to the Assistance Letter filed with the Commission on October 2, 2014 (clarifying flows that trigger and terminate an abnormal low-flow event); November 6, 2015 (addressing gage malfunctions); and June 7, 2016 (clarifying that NIPSCO was not required to release more than 500 cfs from the Oakdale dam).

[9] FWS defined a "low-flow event" as occurring when the 24-hour daily average flow is equal to or less than 300 cfs at the U.S. Geological Survey's (USGS) Winamac gage, located 30 river miles upstream of the Norway dam and 45 river miles upstream of the Oakdale dam, or is equal to or less than 570 cfs at the Oakdale gage, located 0.25 miles downstream of the Oakdale dam.

11.    FWS selected the trigger flows and downstream flow requirements for abnormal low-flow conditions by using linear scaling.[10]  FWS explained that linear scaling is commonly used as a proxy for discharge, based on the assumption that discharge increases as drainage basin area increases.[11]

12.    FWS further explained that it used the Winamac gage to set trigger flows and approximate natural flows because it is the closest upstream gage that is unaffected by the project.  However, NIPSCO, FWS, and USGS have been working to bring a new gage on line at Buffalo Bridge, approximately 12.5 miles upstream of Lake Shafer and 34.9 miles upstream of the Oakdale dam.  By using a gage at Buffalo Bridge, NIPSCO states that it would be able to approximate flows at a point that is not subject to potential water withdrawals that occur between the Winamac and Buffalo Bridge gages.[12]

### B.    License Amendment Proposal

13.    On October 2, 2014, as required by license Article 405, NIPSCO filed a license amendment application proposing a modified definition of "abnormal river conditions" consistent with FWS' recommendations contained in its Assistance Letter.  Specifically, NIPSCO proposed to modify the definition of "abnormal river conditions" in license Article 403 to the following:

> Conditions with river flows of 3,000 cubic feet per second (cfs) or higher; hourly increases in river flow of 100 cfs or greater at both project dams; a 24-hour daily average of river flow of ≤ 300 cfs as measured at the USGS Winamac gage; in the event of an equipment or operation issue at Oakdale unrelated to weather conditions upstream, a 24-hour daily average of river flow of ≤ 570 cfs at the USGS Oakdale gage; or a 24 hour daily average of river flows of ≤ 410 cfs at the NIPSCO Buffalo Bridge gage. Under "abnormal river conditions," as defined by river flow, the licensee shall at all times act to maintain the fluctuation of the reservoir surface elevation within 0.75 feet above (rather than 0.25 feet under normal conditions) and 0.25 feet below elevation

---

[10] *See* Final Environmental Assessment (EA) at 42.  Linear scaling is a method of estimating stream flow at an ungaged stream site with a known drainage area based on flows measured at a gaged site with a known drainage area.  The method assumes that the only factor affecting flows between the two sites is the size of the drainage areas.  The method is also known as the drainage area ratio method.  A linear relationship is shown by a straight line, as opposed to other types of relationships (e.g., exponential or logarithmic).

[11] *See* Order Amending License, 163 FERC ¶ 61,212 at Appendix B at 3.

[12] *See* NIPSCO's October 2, 2014 Application at 6 (Accession No. 20141002-5140).

**Attachment 2**

647.47 feet NGVD for Lake Shafer and 0.75 feet above 612.45
feet NGVD for Lake Freeman.

14.    NIPSCO did not propose a minimum elevation for Lake Freeman during abnormal
flow conditions.

### C.    Environmental Review and Staff Recommendation

15.    On October 9, 2015, Commission staff issued a draft EA which found that NIPSCO's
proposed action would overestimate inflows to Lake Freeman because it was based on the
linear scaling method using data from the Winamac gage, located 45 miles upstream from
the Oakdale dam, and, as a result, did not account for local hydrologic events, including
groundwater inflows, stormwater runoff, evaporation, tributary inflows, changes in the
accuracy of flow measurements over time, or lag time for measured flows to reach the
project.[13]

16.    Instead, the draft EA recommended the staff alternative, which separately defined
abnormal high flows and abnormal low flows.  Abnormal low flows would be triggered by
the same flows as provided in the proposed amendment and Assistance Letter; however,
NIPSCO would not have to release minimum flows that exceed inflow, which would cause
Lake Freeman to drop.  Rather, the staff alternative would require the licensee to cease
generation at both developments and operate the gates to maintain Lakes Schafer and
Freeman at the levels where they were when generation ceased.  Once a triggering event
occurred, outflows would equal inflows and storage in Lake Freeman would not be called
upon to augment low flows downstream of Oakdale dam.

17.    The draft EA found that Commission staff's alternative would reduce adverse effects
of project operations on endangered mussels, while requiring that lake levels be held
constant during abnormal low-flow conditions.  The draft EA explained that the staff
alternative may slightly enhance conditions for listed mussels downstream of the project
compared to current conditions, by maintaining the natural hydrology of the river and by
reducing rapid flow fluctuations that can adversely affect downstream mussels and subject
them to stranding, desiccation, and predation, while protecting the numerous resources of
Lake Freeman that depend on stable lake levels.[14]  Accordingly, the draft EA recommended
the staff alternative.

18.    The Commission received comments in support of and opposition to the draft EA's
recommendations.  Specifically, NIPSCO stated that Commission staff's alternative is not
operation feasible because the dams' equipment is not designed, and cannot be modified to
maintain constant reservoir elevations.  The Protest Coalition agreed with staff's alterative

---

[13] Draft EA at 65.

[14] *Id.* at 80.

**Attachment 2**

and found that science does not support the use of linear scaling.  In response to the comments, Commission staff conducted a publicly-noticed technical conference on May 10, 2016, to discuss the proposed operational changes; the hydraulic analyses performed by NIPSCO, Commission staff, and the Protest Coalition; alternatives to NIPSCO's proposal; and Commission staff's analysis in the draft EA.  Commission staff, NIPSCO, FWS, and the Protest Coalition participated in the conference and met on several occasions thereafter to discuss methods for approximating natural run-of-river flows and minimizing flow variability.  The parties did not reach an agreement.

19.     On November 10, 2016, Commission staff issued a final EA, recommending a modified staff alternative that would require, under abnormal low-flow conditions, that NIPSCO "immediately cease generation at the Oakdale [d]evelopment and at all times act to maintain the reservoir elevation at Lake Freeman at elevation 612.20 feet NGVD."[15]  Staff also requested concurrence from FWS that the staff alternative was not likely to adversely affect federally-listed mussels or adversely modify designated critical habitat.  FWS and the U.S. Environmental Protection Agency (EPA) filed comments on the final EA.  EPA recommended the Commission coordinate with the FWS, clarify whether impacts to mussels would be significant, and assess whether the operation of the project would be resilient to changing climate conditions.

20.     By letter dated December 9, 2016, FWS stated it did not concur with Commission staff's finding in the final EA and requested additional information to prepare its biological opinion.[16]  On February 16, 2017, staff provided FWS with the requested additional information and asked for formal consultation under ESA section 7(a)(2).[17]

21.     On July 6, 2017, the FWS issued a biological opinion for the modified staff alternative.  The biological opinion concurred that the staff alternative is not likely to adversely affect the rayed bean and snuffbox mussels, because it is unlikely those species still occur downstream of the project.[18]  Further, the biological opinion concluded that the staff alternative is not likely to jeopardize the continued existence of the clubshell, fanshell,

---

[15] Final EA at 17.

[16] *See* FWS's December 9, 2016 filing (Accession No. 20161209-5105).

[17] 16 U.S.C. § 1536(a) (2012).

[18] FWS' July 5, 2017 Biological Opinion at 2 (Accession No. 20170706-5012) (Biological Opinion).

**Attachment 2**

sheepnose, and rabbitsfoot mussels, and is not likely to destroy or adversely modify designated rabbitsfoot critical habitat.[19]

22.     However, FWS did not agree with Commission staff's alternative to approximate run-of-river operations at the Oakdale development. FWS stated that under the Commission staff's alternative, during the late summer and early autumn, when flows are often naturally low, the quantity of water released from Oakdale dam would not match the flows that FWS has determined would best mimic the natural flow of the river (i.e., the linearly-scaled flow measured at the Winamac gage). Rather, FWS stated that the best way to protect mussel populations is to maintain run-of-river operations at the Oakdale development using linear scaling.

23.     The biological opinion includes an incidental take statement, with one reasonable and prudent measure to avoid or minimize incidental take, and two terms and conditions to implement that measure. The reasonable and prudent measure is to minimize take of listed mussels by restoring what FWS considers to be a more natural flow regime downstream of Oakdale dam during low-flow periods. To implement the reasonable and prudent measure, the terms and conditions require the adoption of NIPSCO's proposed license amendment and implementation of the Assistance Letter, as clarified, and replacement of readings from the Winamac gage with those from the Buffalo Bridge gage, once that gage is operational.

### D.     Order Amending License

24.     The Order Amending License incorporated FWS' modified incidental take statement, reasonable and prudent measures, and terms and conditions into the license. The order explained that although FWS and Commission staff have different approaches to maintaining run-of-river operations at the Oakdale development, the ESA constrains the Commission's discretion to implement Commission staff's recommended alternative.[20]

25.     On rehearing, the Protest Coalition argues that the Order Amending License: (1) should have adopted the Commission staff alternative; (2) did not adequately consider expert opinion other than that from FWS; (3) should not have adopted FWS' reasonable and prudent measures; (4) ignored riparian rights; and (5) violated the due process clause of the U.S. Constitution.

---

[19] Final EA at 64. In a 2008 comment letter, FWS stated that northern riffleshell mussels are not known to be extant in the Tippecanoe River. *Id*.

[20] Order Amending License, 163 FERC ¶ 61,212 at P 53.

**Attachment 2**

## II.    Discussion

### A.    Order Properly Adopted the Biological Opinion's Method of Operation

26.    On rehearing, the Protest Coalition argues that the Commission should have adopted the Commission staff alternative for project operation.[21]  The Protest Coalition states that FWS found that the Commission staff alternative "is not likely to jeopardize the existence of the clubshell, fanshell, sheepnose or rabbitsfoot mussels and is not likely to destroy or adversely modify designated critical habitat."[22]  The Protest Coalition contends that this "no jeopardy" determination states that harm to endangered mussels and their habitat is not likely to occur under the staff alternative and therefore limits FWS' authority to dictate dam operation measures to the Commission.  As a result, the Protest Coalition concludes that the Commission has the discretion to adopt either its staff alternative or the biological opinion's alternative for operation.[23]

27.    ESA section 7(a)(2) imposes both substantive and procedural responsibilities.  The Protest Coalition, however, overstates the independence of federal agencies in acting under that section.  Although a federal agency must ensure that its action will not jeopardize the continued existence of listed species or destroy or modify their designated critical habitat, it must do so in consultation with FWS or the National Marine Fisheries Service, as appropriate.  Because those agencies are charged with implementing the ESA, they are the recognized experts with regard to matters of listed species and their habitat.  The Supreme Court, in *Bennett v. Spear*, recognized that although a biological opinion "theoretically serves an advisory function … in reality it has a powerful coercive effect on the agency action."[24]  The statutory framework is based on the assumption that the biological opinion will play a central role in the action agency's decision making, and an agency that disregards a biological opinion and proceeds with its proposed action "does so at its own peril."[25]

28.    For these reasons, we affirm the Order Amending License's determination that the ESA constrains our discretion to implement staff's recommended alternative.[26]  Under the

---

[21] Protest Coalition's Request for Rehearing at 1.

[22] *Id*. (quoting Biological Opinion at 2).

[23] Protest Coalition's Request for Rehearing at 1-2.

[24] 520 U.S. 154, 169 (1997) (*Bennett*) (internal citation omitted).

[25] *Id*. at 170.

[26] Order Amending License, 163 FERC ¶ 61,212 at P 53.

**Attachment 2**

Federal Power Act (FPA), the Commission is responsible for balancing environmental and developmental values in determining what measures should be required in connection with relicensing or amending a hydroelectric project. Under the ESA, the FWS has a different role. As the consulting agency, FWS must offer its expert opinion on whether the proposed action is likely to cause jeopardy to the species or destroy or adversely modify the species' critical habitat, without concern for other, possibly competing interests. We would not necessarily expect FWS to reach the same conclusion regarding run-of-river operations as Commission staff did under the FPA. We recognize that FWS' linear scaling approach provides less than ideal certainty in maintaining run-of-river conditions at Lake Freeman. These differing opinions do not provide us with any basis for rejecting the biological opinion here or in the Order Amending License.[27] Further, the importance of the consulting agency's role in protecting endangered species, coupled with the coercive effect of the ESA,[28] make it unlikely that we will act in a manner that is inconsistent with the conditions of a biological opinion.

29.    The Protest Coalition argues that the Order Amending License's reliance on *Bennett* is misplaced, because that case involved a "jeopardy" determination rather than a "no jeopardy" determination.[29] The Protest Coalition argues that this distinction grants the Commission the authority to decide whether it should adopt the reasonable and prudent measures in FWS' "no jeopardy" biological opinion.[30] We disagree. A "no jeopardy" determination does not mean that the proposed action is not likely to cause harm to endangered species and their habitat. Rather, it means that the proposed action will not jeopardize the continued existence of listed species or destroy or modify their designated critical habitat.[31] As explained in the Order Amending License, ESA section 9 prohibits *any* taking of a listed species, except in compliance with an incidental take statement included in a biological opinion after formal consultation.[32] Violations of the ESA, including the taking prohibition, present a risk of civil and criminal penalties, including imprisonment. The Commission is not required to adopt the biological opinion. But, compliance with the terms and conditions of the biological opinion is necessary to ensure that any taking of a listed species does not violate the ESA, thus providing the licensee, as well as the Commission

---

[27] *Id.*

[28] *Bennett*, 520 U.S. at 169-170.

[29] Protest Coalition's Request for Rehearing at 4.

[30] *Id.*

[31] 50 C.F.R. § 402.14(h)(3) (2018).

[32] Order Amending License, 163 FERC ¶ 61,212 at P 53.

**Attachment 2**

and its employees, "safe harbor" from possible prosecution.[33]  The Commission could
choose not to adopt the biological opinion, but in doing so it loses safe harbor protection.[34]
*Bennett* did not limit consideration of safe harbor provisions to compliance with a
"jeopardy" biological opinion, and neither do we.

### B.    FWS' Biological Opinion Used Best Available Data

30.    The Protest Coalition states that the Commission and FWS must use the "best science
and commercially available data" to reach their final determinations.[35]  The Protest
Coalition contends that, during periods of low flow, endangered mussels downstream of the
Oakdale Dam are entitled to the natural river flow, no more, no less; thus, in Protest
Coalition's view, the basic tenet of this case is determining what that flow would be without
the presence of the Norway and Oakdale dams.[36]  The Protest Coalition maintains that the
Commission improperly accepted evidence submitted by FWS over that of its own staff or
other parties.[37]

31.    Under the ESA, the Commission must provide "the best scientific and commercial
data available" for formal consultation, and FWS must use the best available data when
developing its biological opinion.[38]  The purpose of the "best available science standard it to
prevent an agency from basing its action on speculation and surmise."[39]  "The
best available data requirement merely prohibits [an agency] from disregarding available
scientific evidence that is in some way better than the evidence [it] relies on."[40]  An agency

---

[33] 16 U.S.C. § 1536(*o*)(2) (2012).

[34] *Me. Council of the Atlantic Salmon Fed'n v. Nat'l Marine Fisheries Serv.*, 203 F.
Supp. 3d 58, 76 (D. Me. 2016).

[35] Protest Coalition's Request for Rehearing at 2.

[36] *Id*.

[37] *Id*. at 2-3.

[38] 16 U.S.C. § 1536(a)(2) (2012); 50 C.F.R. §§ 402.14(d) and 402(g)(8) (2018).

[39] *San Luis & Delta – Mendota Water Auth. v. Locke*, 776 F.3d 971, 995 (9th Cir.
2014) (*Locke*).

[40] *Kern Cnty. Farm Bureau v. Allen*, 450 F.3d 1072, 1080 (9th Cir. 2006) (*Kern
Cnty*) (quoting *Sw. Ctr. for Biological Diversity v. Babbitt*, 215 F.3d 58, 60 (D.C. Cir. 2000)
(internal quotations omitted).  *See also Locke*, 776 F.3d at 995 ("Moreover, if the only
available data is weak, and thus not dispositive, an agency's reliance on such data does not

**Attachment 2**

"complies with the best available science standard so long as it does not ignore studies, even if it disagrees with or discredits them."[41]

32.    The areas of disagreement between the Protest Coalition and FWS concern the nature and quantity of evidence on which FWS has relied and the ultimate conclusions that may appropriately be drawn from that evidence.  The Protest Coalition asks the Commission to review the validity of the biological opinion and substitute our judgement for that of FWS, the agency Congress has determined in the ESA should be responsible for providing its expert opinion regarding whether amending the operation of the Norway-Oakdale Project is likely to jeopardize the continued existence of the listed species, or destroy or adversely modify its critical habitat.  As we stated above,[42] although Commission staff's analysis concurred with the Protest Coalition's hydrology experts' concerns with FWS' linear scaling approach for determining the low flow requirements for the project,[43] those concerns were not sufficient to lead the Commission to reject FWS' findings in the biological opinion.[44]  Additionally, the Protest Coalition has not provided any additional information to lead us to question those findings now.  None of the Protest Coalition's arguments presented on rehearing or in its protest to the Order Amending License provide any basis for rejecting FWS' finding that project operation can result in the incidental taking of listed mussel species, and that the terms and conditions of the incidental take statement are needed to avoid or minimize the taking.

33.    When a biological opinion is prepared in the course of a Commission proceeding, the only means of challenging its substantive validity is on judicial review.[45]  Therefore, a reviewing court, and not the Commission, must decide whether FWS considered the relevant factors and adequately explained its choices in the biological opinion.  Although the Commission makes an independent decision under the FPA as to what measures should be included in a license amendment, we are unlikely to contradict the consulting agency's

---

render the agency's determination arbitrary and capricious" (quotations and citations omitted)).

[41] *Locke*, 776 F.3d at 995; *Kern Cnty*, 450 F.3d at 1080-81 (quoting *Conner v. Burford*, 848 F.2d 1441, 1454 (9th Cir. 1988)).

[42] *See* P 28, *supra*.

[43] Final EA at 45.

[44] Order Amending License, 163 FERC ¶ 61,212 at P 65.

[45] *City of Tacoma, Wash. v. FERC*, 460 F.3d 53, 75 (D.C. Cir. 2006).

**Attachment 2**

recommendations in the absence of a showing that the biological opinion, and the remainder of the record, do not provide substantial evidence to support them.

C. **The Biological Opinion's Reasonable and Prudent Measure and Implementing Conditions Do Not Constitute a Major Change**

34.    The Protest Coalition states that "reasonable and prudent measures, along with terms and conditions that implement them, cannot alter the basic design, location, scope, duration, or timing of the action and may involve only minor changes."[46] The Protest Coalition asserts that FWS's reasonable and prudent measure and implementing terms and conditions constitute a major change to the Commission staff's alternative because they eliminate the lower reservoir elevation limit of Lake Freeman[47] and the Commission staff alternative set Lake Freeman's reservoir surface elevation no lower than elevation 612.20 feet NGVD, which is 3 inches (0.25 feet) below normal reservoir surface elevation.[48]

35.    We disagree with the Protest Coalition's argument that implementation of these conditions will result in major changes to the staff alternative.[49] We affirm the Order Amending License's determination that although FWS' reasonable and prudent measure would result in lower reservoir levels during periods of low flow, this approach is designed to achieve the same purpose as the Commission staff alternative, to approximate run-of-river flow and protect downstream mussel populations.[50] Thus, we do not consider implementation of the biological opinion's reasonable and prudent measure a major change.

D. **The Order Amending License Considered Riparian Rights**

36.    The Protest Coalition argues that the Order Amending License failed to consider the riparian rights of property owners surrounding Lake Freeman.[51] Specifically, the Protest

---

[46] Protest Coalition's Request for Rehearing at 4 (quoting 50 C.F.R. § 402.14(i)(2) (2018)).

[47] Protest Coalition's Request for Rehearing at 4.

[48] *Id*. at 3.

[49] *See Westlands Water District v. U.S. Dep't of the Interior*, 376 F.3d 853, 876 (9th Cir. 2004) (setting aside a reasonable and prudent measure as a major change because it required the relocation of hundreds of thousands of acre-feet of water, with wide ranging effects).

[50] Order Amending License, 163 FERC ¶ 61,212 at P 66.

[51] Protest Coalition's Request for Rehearing at 5.

**Attachment 2**

Coalition contends that by permitting NIPSCO to lower Lake Freeman, the Commission denied property owners access to navigable waters and the reasonable use of that water for boating, domestic purposes, and recreation.[52]

37.      We disagree.  The Order Amending License acknowledged that removal of the lower lake-level restriction for Lake Freeman would allow NIPSCO to use storage from Lake Freeman to comply with the flow releases from Oakdale dam required by the Assistance Letter.[53]  These drawdowns would result in frequent and substantial adverse effects on other environmental resources associated with Lake Freeman.[54]  For example, the Order Amending License cited to a 1.5-foot drawdown in Lake Freeman that:

> occurred in August 2014 and resulted in lake levels that:
> (a) prevented use of docks and boat lifts, thus stranding boats
> above the water level; (b) caused boat ramp closures; (c) created
> unsafe boating conditions; (d) created a noxious odor due to
> mortality of fish and mussels and decay of exposed aquatic
> vegetation in the lake; (e) significantly diminished recreational
> experiences; and (f) potentially endangered cultural resources
> present at the lake.[55]

Users' access to Lake Freeman will only be restricted during periods of "abnormal river conditions."[56]  However, despite these concerns, as stated above and in the Order Amending License,[57] the ESA constrains the Commission's discretion to implement the staff recommended alternative that set a minimum lake elevation level for Lake Freeman.

---

[52] *Id.*

[53] Order Amending License, 163 FERC ¶ 61,212 at P 52.

[54] *Id.*

[55] *Id.* (citing EA at v).

[56] *See* P 13, *supra*; final EA at 74-76.

[57] *See* PP 27-29, *supra*; Order Amending License, 163 FERC ¶ 61,212 at P 53.

**Attachment 2**

### E.    The Commission Protected Parties' Due Process Rights

38.    The Protest Coalition argues that the Due Process Clause of the Fifth Amendment to the U.S. Constitution imposes an equal protection requirement on the federal government, and that the order denies Lake Freeman users equal protection under that provision.[58]

39.    Constitutional due process requires certain procedural safeguards, including the requirement that a party affected by government action be given "notice reasonably calculated, under all circumstances, to apprise interested parties of the pendency of the action,"[59] and also the "opportunity to be heard at a meaningful time and in a meaningful manner."[60]  With respect to due process and equal protection, the Protest Coalition and other interested persons had an opportunity to present concerns regarding the amendment of the license, and in fact did.  Commission staff issued a notice of NIPSCO's amendment on February 12, 2015, to which the Protest Coalition responded by filing a motion to intervene and protest.[61]  Additionally, Commission staff held a publicly-noticed technical conference on May 10, 2016, to solicit comments on staff's draft EA and on the various hydraulic analyses and expert opinions available.[62]  The Protest Coalition had an opportunity to present its analysis and to ask the FWS questions regarding the methods in its Assistance Letter during the technical conference.  The Commission considered those arguments and agreed with the Protest Coalition in some respects.  Thus, we find that the Protest Coalition was afforded due process and therefore, that users of Lake Freeman and Shafer were afforded similar treatment in our proceeding.

40.    The Protest Coalition contends that the Order Amending License treats users at Freeman Lake disparately from users at Lake Shafer.[63]  The Protest Coalition explains that the order sets a minimum elevation limit at Lake Shafer, which has the effect of protecting

---

[58] Protest Coalition's Request for Rehearing at 5.

[59] *Jones v. Flowers*, 547 U.S. 220, 226 (2006).

[60] *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)).

[61] Order Amending License, 163 FERC ¶ 61,212 at P 25 (staff extended the filing deadline of NIPSCO's amendment application twice, affording interested persons an additional 60 days to file a motion to intervene, comment, or protest).

[62] *Id*. at P 28.

[63] Protest Coalition's Request for Rehearing at 5.

**Attachment 2**

recreation at this lake.[64]  However, Lake Freeman has no lower limit and could potentially be drawn down to the river bed.[65]

41.      "Both the Equal Protection Clause and the [Administrative Procedure Act] prohibit agencies from treating similarly situated petitioners differently without providing sufficiently reasoned justification for the disparate treatment."[66]

42.      We agree that users of Lake Freeman bear the burden of ESA compliance under the requirements of the biological opinion and the Order Amending License, and that users of Lake Shafer are not similarly burdened.  Prior to issuance of the order, the reservoir elevations of Lakes Freeman and Shafer remained within 0.25 feet above or below their normal reservoir elevations, which afforded lake users similar treatment for recreation and tourism.  In the final EA, Commission staff recommended that NIPSCO maintain the reservoir elevation at Lake Freeman at no lower than an elevation of 612.20 feet NVGD[67] in order to preserve the numerous resources at Lake Freeman in addition to enhancing mussel populations downstream of the project.[68]  However, FWS disagreed.  FWS determined that removing Lake Freeman's lower lake-level restriction would allow NIPSCO to use storage from Lake Freeman to comply with the flow releases required by the Assistance Letter. FWS explained that flows downstream of the Oakdale dam (from Lake Freeman) have been frequently reduced as a result of NIPSCO maintaining certain minimum lake levels in Lakes Freeman and Shafer.[69]  FWS stated that mussel mortality linked to dam management is likely to increase with the duration of the natural low-flow period, and that it is essential to the protection of mussels that the Norway-Oakdale Project be managed to avoid even brief episodes of inadequate flow downstream of Lake Freeman.[70]  Thus, FWS required the removal of the lower lake restriction at Lake Freeman to protect endangered mussel species, causing disparate treatment between users at Lakes Freeman and Shafer.  However, we find that because FWS provided sufficient justification for this disparate treatment, the order did not violate the Due Process Clause or the Administrative Procedures Act.

---

[64] *Id.*

[65] *Id.*

[66] *Muwekma Ohlone Tribe v. Kempthorne*, 452 F.Supp.2d 105, 115 (D.D.C. 2006) (citing *Settles v. U.S. Parole Comm'n*, 429 F.3d 1098, 1102-03 (D.C. Cir. 2005)).

[67] Order Amending License, 163 FERC ¶ 61,212 at P 36; final EA at 17.

[68] Order Amending License, 163 FERC ¶ 61,212 at P 32; final EA at 87.

[69] Order Amending License, 163 FERC ¶ 61,212 at P 48.

[70] *Id.*

**Attachment 2**

43.    In summary, for the reasons discussed above, we hereby deny rehearing.

The Commission orders:

        Shafer and Freeman Lakes Environmental Protest Coalition's request for rehearing is denied.

By the Commission.

( S E A L )




                                    Kimberly D. Bose,
                                      Secretary.

**Attachment 2**